**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com
Bahar Sodaify (SBN 289730)
bsodaify@clarksonlawfirm.com
Christina N. Mirzaie (SBN 333274)
cmirzaie@clarksonlawfirm.com
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELINDA WRIGHT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>COSTCO WHOLESALE CORPORATION, a Washington corporation,<br><br>Defendant. | Case No. 3:22-cv-04343-WHO<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, CIVIL CODE § 1750, *et seq.*<br><br>2. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW, BUSINESS AND PROFESSIONS CODE § 17500, *et seq.*<br><br>3. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*<br><br>4. BREACH OF EXPRESS WARRANTY<br><br>5. BREACH OF IMPLIED WARRANTY<br><br>6. UNJUST ENRICHMENT<br><br>**DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ............................................................................................. 1

II.   JURISDICTION................................................................................................ 3

III.  VENUE............................................................................................................. 3

IV.   PARTIES .......................................................................................................... 3

V.    FACTUAL ALLEGATIONS ........................................................................... 5

      A.    Overview of "Dolphin Safe" Tuna............................................................ 5

      B.    Dolphin Safety Legislation .................................................................... 11

      C.    Defendant's "Dolphin Safe" Representations ........................................ 14

      D.    The Fishing Methods Employed To Source the Tuna in Defendant's Products
            Render Defendant's "Dolphin Safe" Representations False and Deceptive.......... 23

      E.    Defendant's Deceptive Track and Verification Representations ........................... 31

      F.    Defendant's "Dolphin Safe" Representations are False, Deceptive, and
            Misleading to Reasonable Consumers ...................................................... 33

      G.    Defendant Misled Plaintiff and Other Reasonable Consumers Who Relied on the
            Material and False "Dolphin Safe" Representations to Their Detriment.............. 38

      H.    No Adequate Remedy at Law................................................................. 39

VI.   CLASS ALLEGATIONS ............................................................................... 42

      COUNT ONE .................................................................................................. 46

      COUNT TWO ................................................................................................. 48

      COUNT THREE .............................................................................................. 50

      A.    "Unfair" Prong........................................................................................ 50

      B.    "Fraudulent" Prong................................................................................. 52

      C.    "Unlawful" Prong.................................................................................... 53

      COUNT FOUR ............................................................................................... 55

      COUNT FIVE ................................................................................................. 56

      COUNT SIX ................................................................................................... 57

PRAYER FOR RELIEF............................................................................................. 57

JURY TRIAL DEMANDED..................................................................................... 58

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Plaintiff Melinda Wright ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, bring this class action against Defendant Costco Wholesale Corporation ("Defendant" or "Costco"). Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## I. <u>INTRODUCTION</u>

1. This class action arises from Costco's false and deceptive labeling and advertising scheme where it promises consumers that its "Dolphin Safe" tuna products, including its Kirkland Signature White Albacore Tuna in Water ("Product(s)"), are sustainably sourced in a manner that does not harm or kill dolphins, thereby setting itself to a higher standard than required under the Dolphin Protection Consumer Information Act ("DPCIA") (16 U.S.C. § 1385). Costco knowingly and intentionally makes these promises about its Products while utilizing unsustainable fishing methods that are known to harm and kill dolphins in order to increase profits at the expense of environmentally concerned consumers and innocent marine life, and to gain an unfair economic advantage over its law-abiding competitors that sell truly "Dolphin Safe" tuna.

2. Indeed, as consumers become more environmentally conscious of how their purchasing decisions impact the environment, consumers value, and are willing to pay more for, seafood with sustainable and eco-positive attributes, such as sustainably sourced "Dolphin Safe" tuna products.[1] However, the grim reality is that such attributes have less to do with conservation and more to do with companies, like Costco, pursuing their own special interests.[2]

//

//

//

---

[1] Robert J. Johnston & Cathy A. Roheim, *A Battle of Taste and Environmental Convictions for Ecolabeled Seafood: A Contingent Ranking Experiment*, 31 Journal of Agric. and Resource Econ. (August 2006), https://www.jstor.org/stable/40987319.

[2] K. William Watson, *'Dolphin Safe' Labels on Canned Tuna Are a Fraud*, FORBES (April 29, 2015), https://www.forbes.com/sites/realspin/2015/04/29/dolphin-safe-labels-on-canned-tuna-are-a-fraud/?sh=17fca69e295e

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

3.      For Costco to gain market share in the tuna product marketplace, an industry worth roughly $42 billion dollars[3] with 98% of canned tuna being packaged with some sort of "Dolphin Safe" labeling,[4] Costco has set its "Dolphin Safe" tuna Products to a higher standard than required by the DPCIA through its various representations and promises about dolphin safety and sustainability, including: (1) adding its own unique "Dolphin Safe" logo on the Products' labels, packaging, and official website; (2) claiming that the Products are "*100%* Traceable from Sea to Shelf;" (3) identifying "*100%* Monofilament Leaders & Circle Hooks," as the purportedly sustainable fishing method used to source the tuna in the Products; (4) promising to consumers by way of its tuna supplier that "*it [does] not and will not utilize tuna caught in a manner that harms dolphins*" and that "*[p]roviding consumers with sustainable and Dolphin Safe tuna remains a top priority*;" (5) describing its tuna sourcing methods as sustainable on its official website; and (6) promoting its involvement and/or founding of organizations like the International Seafood Sustainability Foundation ("ISSF") and the Seafood Task Force ("STF") to further perpetuate its sustainability promises.

4.      Plaintiff herein alleges Defendant's "Dolphin Safe" representations are false, misleading, deceptive, unfair, fraudulent, and unlawful under California's Consumers Legal Remedies Act ("CLRA"), Civil Code Section 1750, *et seq*., Unfair Competition Law ("UCL"), Business and Professions Code Sections 17200, *et seq*., and the False Advertising Law ("FAL"), 17500, *et seq*. Plaintiff also alleges that Defendant has been unjustly enriched and has breached its express and implied warranties about the Products. Defendant's false and deceptive representations are uniformly advertised through its labeling, packaging, and online. Through its false and deceptive advertising, Defendant has misled Plaintiff and other reasonable consumers into buying the Product at stores across California and the United States based on its material representations that the Product is created and manufactured in a manner that is "Dolphin Safe."

5.      Plaintiff brings this action individually and on behalf of those similarly situated to represent a Nationwide Class and a California Class (described *infra*). Plaintiff seeks injunctive

---

[3] Tom Levitt, *Overfishing Puts $42bn Tuna Industry at Risk of Collapse*, THE GUARDIAN, May 2, 2016, https://www.theguardian.com/sustainable-business/2016/may/02/overfishing-42bn-tuna-industry-risk-collapse.
[4] Watson, *supra* note 2.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

relief to cure Defendant's unlawful labeling and advertising of the Products and restitution for money wrongfully acquired by Defendant.

## II.   JURISDICTION

6.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. Section 1332 and the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and defendant are citizens of different states. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

7.      Defendant is subject to personal jurisdiction in California based upon sufficient minimum contacts which exist between Defendant and California.  Defendant is authorized to do and is doing business in California.

## III.   VENUE

8.      Pursuant to 28 U.S.C. Section 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiff is a citizen of California, resides in this District, and purchased the Product within this District. Moreover, Defendant receives substantial compensation from sales in this District, and Defendant made numerous misrepresentations which had a substantial effect in this District, including, but not limited to, label, packaging, and internet advertisements, among other advertising.

## IV.   PARTIES

9.      **Plaintiff Melinda Wright.** The following is alleged based upon personal knowledge: (1) Plaintiff Melinda Wright ("Plaintiff") is, and at all times relevant hereto was, a citizen and resident of Lake County, California. (2) Plaintiff purchased the Product from a Costco store located in Ukiah, California in 2021. Plaintiff paid approximately $15.00 for a pack of 8 cans of the Product. (3) In making her purchase, Plaintiff relied upon Defendant's "Dolphin Safe" promises and representations on the Product's labeling, packaging, and advertising. Plaintiff believed that Defendant used fishing methods that did not harm or kill dolphins and was unaware that the Products

FIRST AMENDED CLASS ACTION COMPLAINT

were not "Dolphin Safe" as Defendant represented and promised. The Product was prepared and approved by Defendant and its agents and disseminated statewide and nationwide, as well as designed to encourage consumers to purchase the Products. The Product's "Dolphin Safe" labeling and advertising representations led Plaintiff to believe that the tuna sourced for sale of the Product were caught using fishing methods that do not kill or harm dolphins. (4) At the time of purchase, Plaintiff did not know that the "Dolphin Safe" representation was false—i.e., Plaintiff did not know that the Product was sourced from tuna caught using fishing methods that kill and injure dolphins. (5) If Plaintiff had known that the Products were not "Dolphin Safe," then Plaintiff would not have purchased the Products, and certainly would not have paid a "premium" for such a valued perceived benefit. (6) Plaintiff continues to see the Products available for purchase and intends to purchase them again under the assumption that Defendant has cured its unlawful business practices and the "Dolphin Safe" representations are in fact true —i.e., Defendant truthfully used sustainable fishing practices which do not kill or harm dolphins in the sourcing of the tuna used for the Products. (7) Plaintiff is not personally familiar with, and does not possess any specialized knowledge skill, experience, or education, in the manufacture of tuna products, commercial fishing methods, or dolphin feeding practices, and, therefore, Plaintiff has no way of determining whether Defendant's Products are actually "Dolphin Safe" as it promises. (8) Plaintiff is, and continues to be, unable to rely on the truth of the "Dolphin Safe" representations.

10.    **Plaintiff's Likely Future Harm**. Plaintiff intends to purchase the Products again with the hope of consuming tuna products which, as represented, are truly "Dolphin Safe," despite the fact that they were once marred by false advertising and labeling. If by that time the Products are not improved by using "Dolphin Safe" fishing practices, as Plaintiff would reasonably, but incorrectly, assume, then Plaintiff is at risk of being deceived again. In that regard, Plaintiff is an ordinary consumer who has no ability to know what fishing practices Defendant is actually using or whether those fishing practices kill or injure dolphins. Accordingly, Plaintiff is at risk of reasonably, but incorrectly, assuming that Defendant fixed its fishing practices such that Plaintiff may buy the Products again, believing they were no longer falsely advertised. Plaintiff is, therefore, currently and in the future deprived of the ability to rely on the "Dolphin Safe" representations.

11.     **Defendant Costco.** Defendant Costco Wholesale Corporation ("Costco") is a nationwide corporation headquartered in Isaaquah, Washington. Costco Wholesale Corporation maintains its principal corporate office at 999 Lake Drive, Isaaquah, Washington 98027. Costco Wholesale Corporation directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the State of California. Costco Wholesale Corporation is the owner, manufacturer, and/or distributor of the Kirkland Tuna Product line, and is a company that created and/or authorized the false, misleading, and deceptive labeling and packaging for the Products.

12.     *Respondeat Superior*. Defendant and its agents manufactured, advertised, marketed, and sold the Products at issue in this jurisdiction and in this judicial district. The unfair, unlawful, deceptive, and misleading false advertising claims on the Products were prepared, authorized, ratified, and/or approved by Defendant and its agents, and, accordingly, disseminated throughout the State of California and the nation by Defendant and its agents in order to deceive and mislead consumers into purchasing the Products.

V.     **FACTUAL ALLEGATIONS**

A.     **Overview of "Dolphin Safe" Tuna**

13.     For decades, commercial fisheries across the globe have posed the greatest threat to marine wildlife, wiping out 90% of all large fish and endangering cetacean species (whales, dolphins, and porpoises), killing roughly 300,000 cetaceans each year.[5] As consumers have become more aware of the damaging effects of commercial fishing on both oceanic fish and mammal species alike, calls for efforts to curb the harmful effects of certain fishing practices have become more prevalent within the fishing industry.

14.     Development of modern fishing techniques and technology such as monofilament fishing line in the early 1960s made it possible for fisheries to expand their fishing practices.[6] Replacing fibrous fishing line with stronger more durable monofilament fishing line allowed commercial longline fishermen to move from short sets of a few dozen hooks, to longlines that

---

[5] *Seaspiracy*, SEASPIRACY, https://www.seaspiracy.org/.
[6] *Fishing Line*, NEW WORLD ENCYCLOPEDIA, https://www.newworldencyclopedia.org/entry/Fishing_line.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

currently average 28 miles long with thousands of hooks attached.[7] Once set, these lines can stay in the water for hours, resulting in overfishing and significant bycatch—or the capture of unintended species, like dolphins.[8] Purse seine fishers also benefited from the new fishing line technology, and were able to set nets around entire schools of tuna in one go.[9] Fishermen in the Eastern Tropical Pacific Ocean ("ETP") noticed that dolphins and tuna frequently swam together, with the dolphins swimming on top of the tuna.[10] Using purse seine nets, fishermen would herd the dolphins and encircle both the dolphins and the tuna swimming underneath them, then seal the bottom to enclose the animals and hoist them on board to harvest the tuna. Fisherman who used to catch tuna one at a time by rod, line, and baitless hook were suddenly able to catch large quantities of tuna. By the end of the 1960s, between 250,000 and 500,000 dolphins were dying in the ETP due to these fishing methods.[11]

15.     In 1972, Congress enacted the Marine Mammal Protection Act ("MMPA"), based on its finding that some marine mammals are in danger of depletion or extinction, and set forth intent to conserve marine mammals.[12] Congress recognized a need to encourage development of international arrangements for research on and conservation of marine mammals, stating that conservation and protection of marine mammals and their habitats is necessary to ensure continuing availability of marine mammals and marine mammal products that move in international and interstate commerce and affect marine ecosystems.[13] Congress also recognized that marine mammals are of international significance, and laid out congressional intent to protect them with sound policies of resource management, with the primary objective of maintaining the health and stability of the marine ecosystem and when possible, maintain an optimum sustainable population.[14]

---

[7] *Fishing Gear: Pelagic Longlines*, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-pelagic-longlines.
[8] *Id.*
[9] Kenneth Brower, *The Destruction of Dolphins*, THE ATLANTIC MONTHLY (July 1989), https://www.theatlantic.com/past/docs/issues/89jul/dolphin.htm.
[10] Lisa T. Balance, et al., *A History of the Tuna-Dolphin Problem: Successes, Failures, and Lessons Learned*, FRONT. MAR. SCI. (Nov. 23, 2021), https://www.frontiersin.org/articles/10.3389/fmars.2021.754755/full.
[11] *Id.*
[12] 16 U.S.C. §1361, *et seq.*
[13] 16 U.S.C. §1361(5)-(6)
[14] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

16.     Dolphins—small-toothed cetaceans that prey on low-mid trophic level fishes and cephalopods—in particular, needed imminent protection as unsustainable tuna fishing practices continued to pose a major threat to dolphin safety and, consequently, the ecosystem.[15] Like all predators, dolphins play an important role in keeping ecosystems balanced: "Without dolphins, the animals they prey on would increase in number, and their predators wouldn't have as much to eat. This would disrupt the natural balance in the food chain and could negatively affect other wildlife and the health of the ocean environment."[16] By dispersing nutrients and mixing water in stratified oceans and rivers, dolphins play a vital role in sustaining and maintaining all sea life.[17] Further, because billions of people depend on the ocean and oceanic fish for food, dolphins function to sustain human life as well. Dolphins, who are extremely intelligent animals, may very well be the Earth's second smartest creatures next to humans.[18]

17.     Yet, despite their ecological importance and extreme intelligence, dolphins are disappearing at alarming rates, and are particularly threatened by today's commercial fishing industry. In fact, sixteen species of whales and dolphins are considered in danger of extinction due to human influences.[19]

18.     For instance, in 1988, video footage taken by an undercover biologist working with Earth Island Institute aired on National U.S. television depicting the capture of dolphins in purse seine tuna fishing nets, sparking national concern for Dolphin Safety from consumers and environmental organizations.[20] A narrator voices over the footage, explaining that the dolphins are intentionally encircled and unable to escape because of exhaustion, unwillingness to leave their pod

---

[15] *Threats to Dolphins & Whales*, DOLPHIN RESEARCH AUSTRALIA INC., https://www.dolphinresearchaustralia.org/learn-about-dolphin-whales/threats-to-dolphins/.
[16] *Bottlenose Dolphins: Our Smart, Sociable Stars of the Sea*, WWF, https://www.wwf.org.uk/learn/wildlife/dolphins#:~:text=Without%20dolphins%2C%20the%20animals%20they,health%20of%20the%20ocean%20environment.
[17] Jeremy Kiszka, Matthew S. Woodstock, & Michael R. Heithaus, *Functional Roles and Ecological Importance of Small Cetaceans in Aquatic Ecosystems*, FRONTIERS (Feb. 25, 2022), https://www.frontiersin.org/articles/10.3389/fmars.2022.803173/full.
[18] David Grimm & Greg Miller, *Is a Dolphin a Person?*, SCIENCE (Feb. 21, 2010), https://www.science.org/content/article/dolphin-person.
[19] *Endangered Species*, DOLPHIN RESEARCH CENTER, https://dolphins.org/endangered_species#:~:text=Overview-Overview,to%20the%20Endangered%20Species%20Act.
[20] Brower, *supra* note 9.

FIRST AMENDED CLASS ACTION COMPLAINT

and young, and devices that impact their safety and ability to use sonar.[21] The nets were intentionally set in the ETP where, at the time, almost 25% of the worlds yellowfin tuna were sourced.[22]

19.    Galvanized by the release of this footage, a host of environmental groups, including Earth Island Institute, launched a boycott of canned tuna to stop the killing of dolphins.[23]

20.    The first widespread manifestation of consumer concern over dolphin deaths came with the canned-tuna boycott, which caused seafood producers to realize that dolphin safety was a quality that consumers valued.[24] Consumers were choosing to purchase dolphin-safe and sustainable seafood products over those that lacked these environmental attributes.[25] This shifted market demand for producers to supply sustainably sourced dolphin-safe products which created a price premium that consumers were willing to pay to obtain such eco-friendly products.[26]

21.    Subsequently, in the interest of promoting international effort to conserve dolphins, Congress adopted the International Dolphin Conservation Act ("IDCA") under the MMPA, allowing for tuna embargos by the U.S. against other countries, establishing dolphin mortality quotas for the U.S., and protecting certain endangered dolphin species.[27]

22.    **The Creation of the "Dolphin Safe" Label**. In response to the increase in consumer demand for dolphin-safe tuna in 1990, the MMPA was amended to adopt the Dolphin Protection Consumer Information Act ("DPCIA"), in part resulting from recognition that consumers wanted to know if the tuna they purchased was dolphin-safe. As fully explained *infra*, this amendment established an official "Dolphin Safe" label (depicted in **Exhibit 1**, *infra*), outlining situations in which it would be a violation of 15 U.S.C. §45 to label a tuna product with either the official

[21] Liz Allen, *"Dolphin-Safe" Tuna Label*, FORBES (Apr. 28, 2021), https://www.forbes.com/sites/allenelizabeth/2021/04/28/the-origin-of-the-dolphin-safe-tuna-label/?sh=7c36b6943c11.
[22] James Joseph, *The Tuna-Dolphin Controversy in the Eastern Pacific Ocean: Biological, Economic, and Political Impacts*, 25 OCEAN DEVELOPMENT AND INTERNATIONAL LAW 1 (1994), https://www.pacifictunaalliance.org/wp-content/uploads/2016/05/tuna-dolphin-controversy.pdf.
[23] Louis Sahagun, *Protests Urge Tuna Boycott Over Killings of Dolphins,* LOS ANGELES TIMES (April 12, 1988).
[24] Lorraine Mitchell, *Dolphin-Safe Tuna Labeling*, AGRICULTURAL ECONOMIC REPORT (AER-793) 2 (January 2001), https://www.ers.usda.gov/webdocs/publications/41203/18892_aer793f.pdf?v=9767.6.
[25] Johnston & Roheim, *supra* note 1.
[26] Chin-Hwa Jenny Sun, et al., *Will American Consumers Pay More for Eco-friendly Labeled Canned Tuna? Estimating US Consumer Demand For Canned Tuna Varieties Using Scanner Data*, 79 MARINE POLICY 62 (May 2017), https://doi.org/10.1016/j.marpol.2017.02.006.
[27] Balance, *supra* note 10.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

"Dolphin Safe" label, the term "Dolphin Safe," or any mark or label depicting dolphins or marine mammals.[28]

23.    **World Trade Organization Dispute.** Beginning in 2011, "Dolphin Safe" labeling standards in the U.S. became a matter of international conflict, bringing the shortcomings of legislative efforts in some areas concerning dolphins to light. Specifically, the World Trade Organization ("WTO") issued a finding regarding a trade dispute between Mexico and the United States. In the dispute, Mexico claimed the DPCIA was discriminatory because it focused heavily and imposed elevated restrictions on purse seine fishing in the ETP, the primary method and location of Mexico's tuna fishing activities, disproportionately compared to other regions.[29] The WTO found the trade restrictions within the DPCIA was in excess of what was necessary to ensure the legislative objective of ensuring consumers were not deceived by dolphin-safe representations, and that U.S. markets not encourage tuna fishing practices that harm dolphins.[30] WTO also found that the DPCIA was not discriminatory to Mexican tuna.[31] This decision was appealed by both Mexico and the United States.[32]

24.    In 2012, amongst other findings, the WTO appellate body found that the DPCIA "is not even-handed in the manner in which it addresses the risk to dolphins arising from different fishing techniques in different areas of the ocean," referring to purse seine fishing in the ETP.[33] In other words, the WTO recognized that other fishing practices in and beyond the ETP were likely as harmful to dolphins as purse seine fishing in the ETP, and that the U.S. regulatory regime did not adequately address these other harmful practices.[34] The Dispute Settlement Body recommended certain changes be made to U.S. regulations to correct these issues.[35] Notably, on the recommendations of the WTO appellate body, the U.S. amended the DPCIA to strengthen the

[28] 16 U.S.C. §1385, *et seq.*
[29] *DS381: United States - Measures Concerning the Importation, Marketing, and Sale of Tuna and Tuna Products*, WORLD TRADE ORGANIZATION (last updated January 31, 2019), https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*

requirements for tuna products labeled "Dolphin Safe" caught outside the ETP, bringing codified labeling standards up to date with WTO requirements.[36]

25.     **Tuna Suppliers Response to WTO Recommendations.** In response to the WTO report, three major tuna suppliers, including Defendant's tuna supplier for the Products, Bumble Bee Foods LLC ("Bumble Bee"),[37] issued a press release through the National Fisheries Institute ("NFI") on May 31, 2012, to reassure consumers that *they do not and would not* catch tuna in a manner that harms dolphins:

> "Household tuna brands **Bumble Bee**, Chicken of the Sea and StarKist are disappointed in the World Trade Organizations (WTO) appeals court ruling because it is likely to create consumer confusion about whether or not their products continue to be Dolphin Safe. The three U.S. brands **want to reassure consumers** they have no reason to be concerned that their companies are wavering in their commitment to providing Dolphin Safe tuna as a result of this ruling. These companies **do not and will not utilize tuna caught in a manner that harms dolphins. Providing consumers with sustainable and Dolphin Safe tuna remains a top priority**."[38] (emphasis added)

26.     At the time of the press release (and currently), Bumble Bee was (and is) the tuna supplier and manufacturer for Defendant's Kirkland Signature tuna products, including the Products at issue.[39] In the press release, Defendant's tuna supplier explicitly reassured consumers that the manner in which its tuna is caught *does not and would not* harm dolphins and expressed its commitment to sustainably sourcing its tuna,  exceeding the DPCIA requirements which do not prohibit unsustainable fishing methods, like longlines which it utilizes to source tuna for the Products, and allows for some dolphin mortality so long as any tuna caught where a dolphin is killed or harmed is clearly separated and not labeled as "Dolphin Safe."[40]  There are no exceptions or caveats to Defendant's tuna supplier's statement that no dolphins are harmed, no incidental dolphin

---

[36] *Id*.; *see also* NOAA, *Enhanced Document Requirements To Support Use of the Dolphin Safe Label on Tuna Products*, 78 FEDERAL REGISTER 40997, https://www.govinfo.gov/content/pkg/FR-2013-07-09/pdf/2013-16508.pdf.
[37] Jon Gertner, *Fish Tale to Understand Costco, Look Inside a Can of its Premium Tuna*, CNN MONEY (Oct. 1, 2003),
https://money.cnn.com/magazines/moneymag/moneymag_archive/2003/10/01/350564/index.html
[38] *Statement on WTO Dolphin Safe Tuna Ruling*, NATIONAL FISHERIES INSTITUTE (May 31, 2012), https://aboutseafood.com/press_release/statement-on-wto-dolphin-safe-tuna-ruling/.
[39] Gertner, *supra* note 37.
[40] 16 U.S.C. §1412(1)-(3)

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

mortality limit, and no clarification on the delineation on level of injury constituting "harm" to dolphins in the process of obtaining Defendant's tuna.[41] *See* **Exhibits 2-6**, *infra*. Simply put, Defendant's tuna supplier, and thus, Defendant, has represented to the public that its tuna is *completely* dolphin-safe.

### B. Dolphin Safety Legislation

27.     For 50 years now, Congress has undertaken legislative efforts to conserve marine mammal populations.[42] Legislation began in partial response to concern from scientists and the general public about the danger of extinction of marine mammals as a result of fisheries, habitat loss, and human activities, and to improve the threatened status of many marine mammals.[43] By setting forth a national policy "to prevent marine mammal species and population stocks from diminishing, as a result of human activities, beyond the point at which they cease to be significant functioning elements of the ecosystems of which they are a part," Congress has paved the way for great progress in marine conservation.[44] Despite their efforts, human activity such as commercial fishing continues to threaten and endanger marine ecosystems and the animals that rely on them.[45]

28.     **Marine Mammal Protection Act.** In 1972, Congress enacted the MMPA and established congressional intent to protect all marine mammals, recognizing that certain species are in danger of extinction or depletion as a result of man's activities. The primary objective of the MMPA is maintaining the health and stability of the marine ecosystem and when possible, maintain an optimum sustainable population.[46] Amongst the species threatened by human activities are many species of dolphins.[47]

29.     **Dolphin Protection Consumer Information Act.** On the heels of boycotts by environmental groups and consumers in response to video footage showing dolphins dying in

---

[41] *Id.*

[42] Marine Mammal Protection Act, *Celebrating 50 Years*, MARINE MAMMAL COMMISSION, https://www.mmc.gov/about-the-commission/our-mission/marine-mammal-protection-act/.

[43] *Id.*

[44] *Id.*

[45] *Threatened and Endangered Species,* MARINE BIO, https://www.marinebio.org/conservation/marine-conservation-biology/threatened-endangered-species/#:~:text=Marine%20animals%20teetering%20above%20extinction,of%20sawfishes%20and%20blue%20whales.

[46] 16 U.S.C. §1361 *et seq.*

[47] *Threats,* WWF, https://wwf.panda.org/discover/knowledge_hub/endangered_species/cetaceans/threats.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

fishing gear, Congress enacted the Dolphin Protection Consumer Information Act ("DPCIA") in 1990. Congress recognized that dolphins and other marine mammals were frequently killed during fishing operations. This Act, which establishes a Federal minimum set of requirements to label a product "Dolphin Safe," was adopted because Congress recognized that "consumers would like to know if the tuna they purchase is falsely labeled as to the effect of the harvesting of the tuna on dolphins."[48] The DPCIA makes it a violation of 15 C.F.R. 45 to label tuna or tuna products "Dolphin Safe" using either the official "Dolphin Safe" mark depicted in **Exhibit 1,** or any other mark or label depicting dolphins, porpoises, or marine mammals in an attempt to communicate that the tuna product is "Dolphin Safe" unless certain minimum requirements are met.[49]

30.    Requirements for use of a mark or label depicting a dolphin to communicate to consumers that the product is "Dolphin Safe" without violating 15 C.F.R. 45 are set forth in 16 U.S.C. 1385 and codified under 50 C.F.R. §216, subpart H. The tuna cannot have been caught using driftnets.[50] If caught in the ETP using a large purse seining vessel, a captain must certify that no nets were intentionally deployed to encircle dolphins and that no dolphins were seriously injured or killed in the specific sets in which the tuna were caught, tracking and verification documentation be submitted to the National Oceanic and Atmospheric Administration ("NOAA"), and if imported, requires an independent observer be aboard during the entire trip.[51] Tuna caught outside the ETP on a purse seine vessel require the tuna to be accompanied by a written statement by a captain certifying that no fishing gear was intentionally deployed to encircle dolphins during the voyage on which the tuna was harvested.[52]

31.    For tuna caught using other fishing methods, to use the official "Dolphin Safe" label without violating 15 C.F.R. 45, a captain of the fishing vessel who has completed the National Marine Fisheries Service Tuna Tracking and Verification Program training must certify that no fishing gear was intentionally deployed on or used to encircle dolphins, and that no dolphins were killed in the specific set or gear deployment in which the tuna was caught.[53]

---

[48] 16 U.S.C. § 1385(b)(3)
[49] 16 U.S.C. §1385(d)(1); *see also* 50 C.F.R. §216.90 *et seq.*
[50] 50 C.F.R. §216.91(a)(3); *see also* 16 U.S.C. §1385(d)(1)(b)(ii)
[51] *Id.*
[52] 16 U.S.C. 1385(d)(1)(B)
[53] 50 C.F.R. §216.91(a)(3)(iii)(a)-(b)

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

32.     If the criteria set forth in Section 1385(d) is satisfied, then Section 1385(d)(3)(A) of the DPCIA identifies the "Dolphin Safe" mark or label that must be used if that particular producer chooses to advertise their product as "Dolphin Safe" (*see* **Exhibit 1** [U.S. Dept. of Commerce Official "Dolphin Safe" logo]). Section 1385(d)(3)(C) specifically states that no other mark or label referring to dolphins, porpoises, or marine mammals, other than the one set forward by subparagraph (A), should be used, *unless*: (i) no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught; (ii) the label is supported by a tracking and verification program which is comparable in effectiveness to the program established under subsection (f); *and* (iii) the label complies with all applicable labeling, marketing, and advertising laws and regulations of the Federal Trade Commission, including any guidelines for environmental labeling."[54]

**Exhibit 1**[55]



33.     Under the DPCIA, it is an FTCA violation to label tuna products "Dolphin Safe" or use any other term or mark unless the requirements as outlined herein are met. The DPCIA and FTCA create a minimum set of requirements for use of the "Dolphin Safe" label, and do not create a substantive right for use of any such label, regardless of any other laws or regulations.

34.     **FTC Labeling Regulations.** Section 5 of the FTC's Consumer Deception Act prohibits "unfair or deceptive acts or practices in or affecting commerce."[56] Deceptive acts are any practices where a "representation, omission, or practice misleads or is likely to mislead the

---

[54] 16 U.S.C. 1385(d)(3)(C)
[55] Dolphin-Safe Tuna Labeling; Official Mark, 65 Fed. Reg. 34408 (June 29, 2000).
[56] "Federal Trade Commission Act Section 5: Unfair or Deceptive Acts or Practices," https://www.federalreserve.gov/boarddocs/supmanual/cch/200806/ftca.pdf.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

consumer, [a] consumer's interpretation of the representation, omission, or practice is considered reasonable under the circumstances; and [t]he misleading representation, omission, or practice is material."[57]

35.    This Complaint centers around Defendant's misleading "Dolphin Safe" promises and representations to consumers, and whether Defendant breached those promises by failing to meet its own heightened "Dolphin Safe" representations, in violation of California's consumer protection laws.

### C.    Defendant's "Dolphin Safe" Representations

36.    Defendant has attempted to set itself apart from other major retailers who carry "Dolphin Safe" tuna products by introducing to consumers its own "Dolphin Safe" tuna Products through an extensive marketing campaign premised on its dolphin safety and sustainability promises and representations that exceed those required by the DPCIA, as follows:

- Defendant includes its own unique "Dolphin Safe" logo on its Product packaging and official website (*see* **Exhibits 2-5**, *infra*);

- Defendant promises that its Products are "Dolphin Safe" throughout its Product packaging and official website (*see* **Exhibits 2-6**, *infra*);

- Defendant promises that its Products are "100% Traceable from Sea to Shelf" and that it utilizes "100% Monofilament Leaders & Circle Hooks," which it purports is a sustainable fishing method (*see* **Exhibits 3 and 5**, *infra*);

- Defendant, via its tuna supplier, promises consumers that it "*[does] not and will not utilize tuna caught in a manner that harms dolphins*" and that "*[p]roviding consumers with sustainable and Dolphin Safe tuna remains a top priority*;" [58]

- Defendant highlights its participation in the International Seafood Sustainability Foundation ("ISSF"), which promises to prioritize the long-term conservation and

---

[57] *Id.*
[58] *Statement on WTO Dolphin Safe Tuna Ruling*, *supra* note 38.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

sustainable use of tuna stocks, illegal fishing prevention, reducing bycatch and promoting ecosystem health (*see* **Exhibits 7 and 8**, *infra*);[59]

- Defendant indicates that it is a founding member of the Seafood Taskforce, which promises to focus on Illegal, Unreported and Unregulated Fishing (IUU) and specific and measurable work plans for addressing supply chain traceability (*see* **Exhibit 8**, *infra*);[60]

- Defendant promises on its "Sustainable Fisheries & Aquaculture" webpage, that its primary objectives of its seafood sourcing policy are to "continue to improve sustainably sourced seafood from either wild fisheries or farmed aquaculture in ways that meet current standards without compromising the availability of scarce resources for future generations" (*see* **Exhibit 7**, *infra*);[61]

- Defendant promises that in sourcing its seafood, it considers "the protection of and respect of the marine, coastal, and freshwater ecosystems; and practices that will mitigate or limit environmental impacts associated with aquaculture and fishing practices" (*see* **Exhibit 7**, *infra*).[62]

37.     **The Product's "Dolphin Safe" Label and Advertisement.** Defendant labels and promises on every can of the Product that it is "Dolphin Safe" and incorporates its own "Dolphin Safe" logo. The Products also have their own dedicated webpage on Defendant's website, where the Products are advertised as "Dolphin Safe." *See* **Exhibits 2-6**, *infra*.[63]

//

//

//

---

[59] *Costco Wholesale Corporation Sustainability Commitment 2018*, Costco Wholesale Corporation, https://mobilecontent.costco.com/live/resource/img/sustainability-archive/2018-sustainability-archive.pdf.
[60] *Aims and Objectives,* SEAFOOD TASK FORCE, https://www.seafoodtaskforce.global/aims-objectives/.
[61] *Sustainable Fisheries & Aquaculture*, COSTCO, https://www.costco.com/sustainability-fisheries.html.
[62] *Id.*
[63] Website descriptions and images of the Products were taken from Defendant's Product packaging and official website: Costco Wholesale, Home / Grocery, Household Essentials & Pet / Pantry & Dry Goods / Canned Goods, https://www.costco.com/kirkland-signature-solid-white-albacore-tuna-inwater%2c-7-oz%2c-8-count.product.100340189.html.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

**Exhibit 2**



**Exhibit 3**



16

1

**Exhibit 4**

2

3

4

5

6

7

8

9

10

11



12

**Exhibit 5**

13

14

15

16

17

18

19

20

21

22

23



24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**Exhibit 6**



38.     **"100% Traceable" and "100% Monofilament Leaders and Circle Hooks"**
**Claims**. Defendant represents that its Products are "100% Traceable from Sea to Shelf" and that it
utilizes "100% Monofilament Leaders & Circle Hooks," to further promote its own "Dolphin Safe"
representations beyond the requirements of the DPCIA.  *See* **Exhibits 3 and 5**, *supra*.

39.     Traceability and supply chain transparency is vital to verify sustainability and
demonstrate that a product is ethically and sustainably sourced.[64] In the seafood sector, effective
traceability can be defined as the ability to identify the origin of the product and sources of input
materials, as well as the ability to conduct backward and forward tracking using recorded
information to determine the specific location and history of the product.[65] Defendant represents the
Products as "100% Traceable from Sea to Shelf,"  and that it provides the traceability needed to
ensure its Products are produced in an environmentally and socially responsible way.[66] *See* **Exhibits**
**8 and 9**, *infra*.  However, as discussed fully *infra*, Defendant does not have a tracking program in

---

[64] *Traceability in Farmed Shrimp,* WWF, https://seafoodsustainability.org/aquaculture/farmed-shrimp/traceability/#:~:text=Without%20visibility%2C%20it%20is%20impossible,is%20ethically%20and%20sustainably%20sourced.
[65] *Traceability - is your seafood really what is says on the tin?,* ASC Aqua, https://www.asc-aqua.org/aquaculture-explained/is-the-asc-a-credible-standard/traceability-is-your-seafood-really-what-it-says-on-the-tin/.
[66] *Sustainable Fisheries & Aquaculture*, *supra* note 61.

18

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

place for its tuna Products and acknowledges issues with traceability, rendering its representations false and deceptive.

40.     Defendant also advertises that it utilizes "100% Monofilament Leaders & Circle Hooks." *See* **Exhibits 3 and 5,** *supra.* This means that Defendant uses monofilament leaders and circle hooks, which are types of fishing gear used in longline fishing.  Contrary to Defendant's promises of sustainability,  this type of fishing method is not sustainable and in fact, known to harm and kill dolphins.[67] Furthermore, monofilament leaders, as opposed to wire leaders, have been shown to have *higher* rates of bycatch and increase catch rate because of their low visibility in the water.[68] Dolphins can also inadvertently ingest circle hooks, resulting in injuries.[69] Also, when hooked, dolphins can and do drown if not released before becoming too exhausted.[70]

41.     **Defendant's Tuna Supplier Promises Sustainability and No Harm to Dolphins.** Defendant further represented its tuna as "Dolphin Safe" beyond the requirements imposed by the DPCIA, when its tuna supplier, Bumble Bee, issued a press release where it reassured consumers that there is no reason to be concerned about its companies' commitment to providing "Dolphin Safe" tuna, *and that providing sustainable "Dolphin Safe" tuna was still its top priority*. [71] It also explicitly promised that it "*[does] not and will not utilize tuna caught in a manner that harms dolphins*"[72] (emphasis added). Unlike the DPCIA, which allows for some incidental dolphin mortality and contains many caveats and limitations, Defendant's tuna supplier explicitly promised that the manner used to catch the tuna would not and will not harm dolphins, or said differently, that the tuna supplied to Defendant for its Products is *completely* "Dolphin Safe," exceeding the DPCIA's requirements.

42.     **Sustainability Representations**. Defendant promises that its Products are "Dolphin Safe" and makes representations of sustainable tuna fishing and sourcing practices to further its heightened "Dolphin Safe" promises. For example, on its website, Defendant highlights its

---

[67] *Fishing Gear: Pelagic Longlines*, *supra* note 7.
[68] *Monofilament / Wire Leaders,* BYCATCH MANAGEMENT INFORMATION SYSTEM, https://www.bmis-bycatch.org/mitigation-techniques/monofilament-wire-leaders.
[69] *Careful Catch and Release*, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION FISHERIES, https://media.fisheries.noaa.gov/2021-04/cc_brochure_web_042021.pdf.
[70] *Fishing Gear: Pelagic Longlines*, *supra* note 7.
[71] *Statement on WTO Dolphin Safe Tuna Ruling*, *supra* note 38.
[72] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

participation in the ISSF, its involvement as a founding member of the SFT, and describes its seafood sourcing policy.[73]  *See* **Exhibits 7-8**, *infra*.

**Exhibit 7**



**Exhibit 8**



---

[73] *Costco Wholesale Corporation Sustainability Commitment*, Costco, https://www.costco.com/sustainability-introduction.html.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

43.    **International Seafood Sustainability Foundation.** Defendant's tuna suppliers for the Products are participants in the ISSF.[74] *See* **Exhibit 8**, *supra*. The ISSF is a partnership among global scientists, tuna processors, and the World Wildlife Fund ("WWF"), with the aim to "undertake science-based initiatives for the long-term sustainability of tuna stocks, reduction of by-catch and promotion of ecosystem health."[75] Defendant provides a link on its webpage to the ISSF website which expressly states that it is "committed to the long-term conservation and sustainable use of global tuna fisheries." Yet, as noted by environmental activist group, Greenpeace, the ISSF is actually "nothing more than a front for giant tuna companies" to deflect criticism of their "so-called sustainability initiatives largely reflect[ive] [of] legal requirements already in place" and instead "delay adoption of real solutions"[76] to solve sustainability issues in the seafood supply chains.

44.    **Seafood Task Force**. Defendant promotes on its official website that it is a founding member of the STF, an industry-led group that purportedly aims to drive greater business confidence for global seafood buyers purchasing from Asia by tackling fishing practices in Thailand's seafood supply chain[77] and improving social and environmental performance.[78] *See* **Exhibit 8,** *supra*.

45.    Defendant's vice president, Ken Kimble, currently sits on the board of the STF as Chairperson.[79] Costco founded the STF in 2014 after investigative journalism implicated Costco and customers of Charoen Pokphand Foods (CPF) in a discovery of forced labor on a production vessel producing shrimp that ended up on shelves of grocery stores in the United States and

---

[74] *Costco Wholesale Corporation Sustainability Commitment 2018*, *supra* note 59.

[75] *Tuna 101*, BUMBLE BEE, https://www.bumblebee.com/seafood-school/tuna-101/#:~:text=The%20ISSF%20mission%20is%20to,Organizations%20(RFMO)%20scientific%20committees.

[76] *How the International Seafood Sustainability Foundation (ISSF) Environmental Action*, GREENPEACE. https://www.greenpeace.org/usa/oceans/sustainable-seafood/how-international-seafood-sustainability-foundation-blocks-environmental-action/.

[77] *Seafood Task Force*, THE SEAFOOD ALLIANCE FOR LEGALITY AND TRACEABILITY ("SALT"), https://www.salttraceability.org/effort/seafood-task-force/#:~:text=The%20Seafood%20Task%20Force%20(formerly,Thai%20processors%20and%20feed%20companies.

[78] *Sustainable Fisheries & Aquaculture*, *supra* note 61.

[79] *Approach*, SEAFOOD TASK FORCE, https://www.seafoodtaskforce.global/approach/elected-board/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

European Union countries.[80,81] In their 10 Point Action Plan of 2021, the STF acknowledges that it "exists to help its members achieve better oversight and transparency tackling complexities across the entirety of the supply chain."[82]

46.     The STF acknowledges "the complexity of fishing supply chain, and issues surrounding labor and illegal fishing in seafood supply chains," [83] which prevents "100%" transparency as Defendant represents. To achieve supply chain transparency, a company must know what is happening throughout every step of its supply chain.[84] And even if Defendant's purported goal may be to achieve transparency, it cannot, and has not due to issues surrounding transparency in the fishing industry, which Defendant acknowledges. [85]

47.     **Seafood Sourcing Policy**. Defendant further discusses on its "Sustainable Fisheries & Aquaculture" webpage its seafood sourcing policy, expressly promising "sustainably sourced seafood" (which includes tuna), the "protection of and respect for marine, coastal, and freshwater ecosystems" (which includes dolphins), and engaging in "practices that will mitigate or limit environmental impacts associated with aquaculture and fishing practices" (which includes sustainable fishing practices) when sourcing seafood.[86] *See* **Exhibit 7**, *supra*. Despite its representations, Defendant's tuna suppliers utilize fishing methods that are neither sustainable nor "Dolphin Safe."

48.     Defendant acknowledges "the seafood industry['s] increasing pressure to make its complex supply chains more transparent," discussing its purported shrimp traceability mechanism, but makes no mention of a traceability and tracking program for its "Dolphin Safe" *tuna* Products, even though it identifies that "[t]raceability programs are *key* to identifying these factors"[87] (emphasis added).

---

[80] *About, Story so Far,* SEAFOOD TASK FORCE, https://www.seafoodtaskforce.global/about/story-so-far/.
[81] *Aims and Objectives, supra* note 60.
[82] *10 Point Action Plan 2021* at pg. 9, SEAFOOD TASK FORCE, https://www.seafoodtaskforce.global/.
[83] *Aims and Objectives, supra* note 60.
[84] *Fake my Catch,* GREENPEACE, https://www.greenpeace.org/usa/wp-content/uploads/2022/08/FakeMyCatch_EN.pdf.
[85] The Task Force's Overarching Objective Is - Supply Chain Oversight, SEAFOOD TASK FORCE, https://www.seafoodtaskforce.global/aims-objectives/.
[86] *Sustainable Fisheries & Aquaculture*, *supra* note 61.
[87] *Id.*

**D.      The Fishing Methods Employed to Source the Tuna in Defendant's Products Render Defendant's "Dolphin Safe" Representations False and Deceptive**

49.      Defendant represents to consumers that its Products are "Dolphin Safe" by representing that its tuna is sustainably sourced in a manner that does not harm or kill dolphins. Yet, these representations are false and deceptive because the manufacturing of the Products involve unsustainable fishing practices that are known to kill and harm dolphins and other marine life.

50.      **Defendant's Tuna Supplier.**  Defendant's tuna supplier for the Products, Bumble Bee, has been supplying and producing canned tuna for over 120 years.[88] In 2002, Defendant struck a deal with Bumble Bee to supply and manufacture the Kirkland Signature tuna products, which include the Products.[89]

51.      On May 31, 2012, Bumble Bee, along with fellow giant tuna companies and suppliers, StarKist and Chicken of the Sea, issued a press release through their representative, seafood trade association, the NFI, assuring consumers that despite the WTO's appeal court ruling, "[they] do not and will not utilize tuna caught in a manner that harms dolphins…[p]roviding consumers with sustainable and Dolphin Safe tuna remains a top priority."[90]

52.      Bumble Bee outlines its fishing practices on its website, where it admits to using longlines to harvest the tuna used in tuna products—an unsustainable fishing method known to harm and kill dolphins,[91] as discussed *infra* (*see* ¶ 26). Bumble Bee explains that: "[The] product[s] [are] caught using longline fishing gear. Longline fishing is the best method for catching large, adult tuna that swim deeper in the water column, and is used to catch mature albacore, yellowfin, and bigeye tuna."[92] Defendant contracted with, and continues to employ Bumble Bee as its supplier for its canned tuna Products, despite Bumble Bee's open statement regarding its use of longlines, an unsustainable fishing method.

//

//

---

[88] https://www.bumblebee.com/about/, *see also Tuna 101*, *supra* note 75.
[89] Gertner, *supra* note 34.
[90] *Statement on WTO Dolphin Safe Tuna Ruling*, *supra* note 38.
[91] *Albacore Tuna*, Bumble Bee, https://www.bumblebee.com/seafood-school/tuna-101/albacore/.
[92] *Trace My Catch*, Bumble Bee, https://www.bumblebee.com/tracemycatch/results.

23

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

53.     In November 2019, Taiwan-based seafood producer, FCF Co. Ltd ("FCF"), purchased Bumble Bee's assets for roughly $925 million.[93] FCF is "one of the world's largest marine products integrated supply chain service provider companies specializing in tuna," with thirty subsidiaries and over fifty years of experience in trading and marketing tuna products.[94] FCF is also one of the world's largest tuna suppliers that harvests tuna on a massive scale.[95] Bumble Bee, by way of its parent company, FCF, is and continues to be the supplier and manufacturer of all tuna products sold under the "Kirkland" brand name, which includes the Products.

54.     Although FCF touts its compliance with industry standards and practices that appear concerned with sustainability, such representations are instead created purely to deflect criticism from tuna fisheries that carry out unsafe fishing practices.  For instance, on its "Tuna Sustainability Policy," FCF claims to "support sustainable fishing methods" by promoting and providing seafood products from Marine Stewardship Council ("MSC") certified seafood fisheries.[96]

55.     The MSC is a non-profit organization that aims to set standards for sustainable fishing. Although the MSC purports that their blue fish label provides an "assurance" that the seafood product "came from a certified sustainable fishery,"[97] there is growing concern among industry watchdogs that the bar for MSC approval has been dropped to low: "critics suggest the [MSC acceptance] bar has been dropped unacceptably low in order to satisfy ever-growing market demand by getting more (generally large industrial) fisheries into the program . . . [c]oncerns around lowering of the bar have resulted in several objections to recent fishery certifications and in published critiques of the MSC's Standard and its application."[98]

//

---

[93] Amelia, Lucas, *Bumble Bee Files for Bankruptcy*, CNBC (Nov. 22, 2019), https://www.cnbc.com/2019/11/22/bumble-bee-files-for-bankruptcy.html.
[94] *Learn Who We Are*, FCF, https://fcf.com.tw/learn-who-we-are/.
[95] *2021 Tuna Retailer Scorecard: The High Cost of Cheap Tuna*, GREENPEACE (Dec. 2, 2021) https://www.greenpeace.org/usa/reports/2021-tuna-retailer-scorecard-the-high-cost-of-cheap-tuna/.
[96] *Tuna Sustainability Policy*, FCF (Apr. 26, 2021), https://fcf.com.tw/wp-content/uploads/2021/12/1-FCF-Tuna-Sustainability-Policy_v3.1-FCF-T-R-E-001.pdf.
[97] *Learn More*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-us?gclid=CjwKCAjwiJqWBhBdEiwAtESPaJ8EaNNatf0Rvn3DjAXptZNtUrLRsGScWsFCmKpEMUMXwk0qg5CIwRoCLpwQAvD_BwE.
[98] Amy Hammond & Callum Roberts, *Why The Marine Stewardship Council Needs an Independent Review*, ETHICAL CONSUMER (July 26, 2021), https://fcf.com.tw/wp-content/uploads/2021/12/1-FCF-Tuna-Sustainability-Policy_v3.1-FCF-T-R-E-001.pdf.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

56.     FCF has also faced scrutiny over its lack of transparency and monitoring, particularly regarding their bycatch.[99] In a September 2022 report released by Greenpeace East Asia, investigators for Greenpeace used Bumble Bee's "Trace My Catch" tool, which allows consumers to input their product code to purportedly learn where their seafood is sourced, in combination with cross-checking with other sources, and found that the information on hundreds of tuna cans manufactured by Bumble Bee sold across the United States was inaccurate or incomplete, including information that vessels were not fishing in areas they were supposed to be fishing (i.e., illegal fishing).[100] In response to this report, representatives for FCF and Bumble Bee indicated that they continue to work with their supply chain, "with others in the industry and the Seafood Task Force to reduce IUU fishing" worldwide, [101] which in turn further confirms that Defendant's "100% Traceable from Sea to Shelf" claim is inaccurate and misleading. *See* **Exhibits 3 and 5,** *infra.*

57.     **The Fishing Methods Used to Source Tuna for the Products are Unsustainable and Not "Dolphin Safe."** Sustainable fishing "guarantees there will be populations of ocean and freshwater wildlife in the future."[102] As seafood demand has grown and advances in technology have expanded, certain fishing practices deplete fish populations, leading to unsustainable fishing practices.[103] These unsustainable fishing practices include longlines and purse seines, resulting in overfishing and significant bycatch—or the capture of unintended species, like dolphins. [104] Consumers reasonably believe that tuna products that are represented as sustainably sourced do not contribute to the harm or death of marine life, including dolphins.

58.     Defendant recognizes the importance consumers place on purchasing tuna products that are sustainably sourced, making several sustainability representations and dedicating an entire webpage to notify its consumers about its purported sustainable fishing practices. Yet, Defendant's

---

[99] Monica Evans, *Tuna Supply Chains Under Scrutiny As Bumble Bee brand Changes Hands,* MONGABAY (February 7, 2020), https://news.mongabay.com/2020/02/tuna-supply-chains-under-scrutiny-as-bumble-bee-brand-changes-hands/.

[100] Elizabeth Claire Alberts, *Illegal Fishing, Worker Abuse Claims Leave a Bad Taste for Bumble Bee Seafood,* MONGABAY (September 2, 2022), https://news.mongabay.com/2022/09/illegal-fishing-worker-abuse-claims-leave-a-bad-taste-for-bumble-bee-seafood/; *see also, Fake My Catch*, *supra* note 84.

[101] *Id.*

[102] *Sustainable Fishing*, NATIONAL GEOGRAPHIC SOCIETY, https://education.nationalgeographic.org/resource/sustainable-fishing.

[103] *Id.*

[104] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

representations of dolphin safety and sustainability (*see* **Exhibits 2-8**, *supra*), deceives Plaintiff and other consumers to reasonably believe that the Products are sustainably sourced using fishing methods safe for dolphins, when, in reality, the fishing methods utilized are unsustainable and known to seriously harm and kill dolphins.[105, 106]

59. In fact, in 2017, <u>Greenpeace listed Defendant's Products among the bottom eight tuna brands based on sustainability and ethical concerns for ocean wildlife</u>, indicating that Defendant uses longlines for the Products, a clearly unsustainable method that leads to bycatch causing serious injury or death to dolphins and other marine life.[107]

60. <u>Most recently, in 2021, Greenpeace listed Defendant among the bottom seven tuna brands based on sustainability and human rights concerns</u>. Out of the sixteen major U.S. tuna retailers ranked by Greenpeace, Defendant ranked tenth and received a failing score in every available category, including the company's tuna procurement policy, traceability policies, and consumer education/labeling. Greenpeace concluded that such results were "extremely disappointing given [Defendant's] size and influence . . . ."[108]

61. Defendant identifies that the tuna in its Products is caught using "100% Monofilament Leaders & Circle Hooks." *See,* **Exhibits 3 and 5**, *supra.* Based on Defendant's labeling and advertising representations, consumers reasonably believe that this method of fishing is sustainable and dolphin- safe, but this is not the reality. Monofilament leaders, as opposed to wire leaders, are not sustainable or dolphin-safe because they are hazardous to marine mammals like dolphins, sea turtles, sharks, and sea birds which become entangled in or ingest the almost invisible wire, leading to injury and death. [109] Further, circle hooks are fishing hooks that are curved back into a circular shape, which although decrease the likelihood that the hooks will be swallowed by fish and

---

[105] *Dolphin-Friendly Fishing 7 Viewing Tips*, SARASOTA DOLPHIN RESEARCH PROGRAM, <u>https://sarasotadolphin.org/wp-content/uploads/2020/09/Dolphin-Friendly-Tips-1.pdf</u>.
[106] *Bottlenose Dolphins – Increase in Depredatory (Stealing) Behavior and Deaths Associated with Recreational Fishing Gear*, NOAA (Oct. 2006), <u>https://nmssanctuaries.blob.core.windows.net/sanctuaries-prod/media/archive/dolphinsmart/pdfs/dolphin_dep.pdf</u>.
[107] *2017 Tuna Shopping Guide*, GREENPEACE, <u>https://www.greenpeace.org/usa/oceans/tuna-guide/</u>.
[108] Josh Stride, *The High Cost of Cheap Tuna: U.S. Supermarkets, Sustainability, and Human Rights at Sea*, GREENPEACE (2021), p. 32. <u>https://www.greenpeace.org/usa/reports/2021-tuna-retailer-scorecard-the-high-cost-of-cheap-tuna/</u>.
[109] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

cetaceans alike, it is well known that when hooked, dolphins can and do drown if not released in time.[110]

62.     Monofilament, or nylon, lines are widely used in the commercial fishing industry.[111] Monofilament lines are commonly used for both the mainline (the longline) and branchlines (which hang off the main longline).[112] The use of monofilament leader lines is a type of nylon line used in longline fishing,[113] the type of fishing method Defendant's supplier has acknowledged using to supply tuna for the Products.[114]

63.     Longline fishing is one of the most damaging fishing methods to dolphins and marine ecosystems.[115] And as much as thirteen percent of the world's tuna is caught using this method. Each day, longline fishing boats set out enough line to wrap the world five-hundred times.[116] Longline fishing involves casting out fishing lines that extend over sixty miles in length and contain thousands of hooks, which can ensnare birds, marine mammals, and juvenile fish. Longline fishing also requires "backbreaking, dangerous, and relentless work . . . ."[117]

64.     Longline fishing is a method of fishing that is known to kill and seriously harm various dolphin species.[118] Longline fishing has been recognized as an unsustainable fishing practice because it is indiscriminate in that it attracts and snags a wide array of non-target marine life, known as bycatch, including dolphins, sharks, seals, sea turtles, sea birds, and other marine mammals.[119] Interactions with longlines for these non-target marine animals have been known to cause injury and death.[120] The average longline is set at 28 miles long.[121] The NOAA lists dolphins, bottlenose

---

[110] *Fishing Gear: Pelagic Longlines*, *supra* note 7.
[111] *Monofilament / Wire Leaders*, *supra* note 68.
[112] *Id.*
[113] *Monofilament/Wire Leaders*, *supra*, at 104.
[114] *Solid White Albacore Tuna vs. Chunk Light Tuna: Not All Tuna is Created Equal,* BUMBLE BEE FOODS, LLC. https://www.bumblebee.com/seafood-school/albacore-tuna-vs-chunk-light-tuna/.
[115] *Why Bumble Bee Tuna Should Concern You (Hint: It's Human Rights and Destructive Fishing)*, GREENPEACE, (Mar. 19, 2020) https://www.greenpeace.org/usa/why-bumble-bee-tuna-should-concern-you-hint-its-human-rights-and-destructive-fishing/.
[116] *Seaspiracy*, *supra* note 5.
[117] *2017 Tuna Shopping Guide*, *supra* note 107.
[118] *Fishing Gear: Pelagic Longlines*, *supra* note 7.
[119] *Mitigating Bycatch and Depredation of Marine Mammals in Longline Fisheries. ICES Journal of Marine Science: Journal du Conseil*, 72(5), 1576-1586 DOI: 10.1093/icesjms/fsv092
[120] *Id.*
[121] *Fishing Gear: Pelagic Longlines*, *supra* note 7.

FIRST AMENDED CLASS ACTION COMPLAINT

dolphins, and several species of whales as having been documented as longline bycatch, with injuries including lacerations, puncture wounds, exhaustion, and drowning.[122]

65.     In addition to the dangers posed by entanglement in fishing gear, *ingestion* of fishing gear is often lethal for cetaceans because it can damage the animals' interior organs. In a study of bottlenose dolphins, seven out of twelve ingestion cases lead to the death of the animal.[123]

66.     Furthermore, the economic costs associated with marine mammal depredation of longlines (fish removed from fishing gear by predators during hauling) have led fishermen to harass and kill dolphins by shooting them, using explosives, or otherwise employing harmful measures to avoid depredation and gear damage.[124] Besides the obvious dangers of serious injury and death that such practices impose on dolphin pods globally, they also have the potential to alter the distribution of dolphin populations, forcing them away from their usual feeding grounds and negatively impacting the fitness of entire pods (e.g., lowering the rates of successful reproduction and increasing the pods' susceptibility to diseases).[125]

67.     **Driftnet Fishing.** In Greenpeace's September 2022 report, FCF-owned Bumble Bee—Defendant's tuna supplier—is suspected of having engaged in IUU fishing (which includes the use of illegal fishing gear such as driftnets)—in seafood entering the U.S. market.[126] Tuna caught using driftnet fishing practices, is not sustainable and cannot be sold under a "Dolphin Safe" label.[127] Driftnet (i.e., drift gillnet) fishing is a fishing technique that uses and hangs nets vertically in the water column without any anchoring at the bottom.[128] The nets are kept this way by floats that are attached to a rope at the top of the net and weights attached to another rope at the bottom of the net.[129] The use of driftnet fishing—also known as the "wall of death"[130]—is incredibly destructive to the marine ecosystem, as driftnet fishing results in large, non-targeted bycatch, such as dolphins,

---

[122] *Id.*

[123] Anino Ruusuvuori, *Fishery Related Injuries to Cetaceans Off the Norwegian Coast*, Halmstad University School of Business, Engineering, and Science (2017), http://www.diva-portal.org/smash/record.jsf?pid=diva2%3A1191646&dswid=-1768.

[124] *Id.*

[125] *Id*.

[126] Alberts, *supra* note 100.

[127] *See,* 16 U.S.C. § 1385(d)(1)(A)

[128] *Drift net Fishing*, InforMEA, https://www.informea.org/en/terms/drift-net-fishing.

[129] *Id.*

[130] *Global Ban on Driftnets,* Greenpeace, https://www.greenpeace.org/usa/victories/global-ban-on-driftnets/.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

sharks, sea turtles, and other marine life that often ends up killing them, or are thrown back into the ocean seriously injured or dead.[131]

68.    **Bycatch**. "Bycatch" refers to the unintentional hooking or ensnaring of marine life.[132] Marine mammals such as dolphins and whales caught as a result of bycatch are unable to surface for air, causing suffocation and a painful death.[133] The following fishing practices are associated with dolphin bycatch: "gillnets, purse seine nets, fish aggregating devices, and *longlines*."[134]

69.    Marine mammals such as Risso's dolphins, bottlenose dolphins, and false killer whales are often entangled or hooked on longline gear and consequently injured or killed. Such injuries include, but are not limited to, lacerations, puncture wounds, exhaustion, and drowning.[135] The average bycatch rate for longlines, like those used by Defendant's suppliers, is more than twenty percent of the total catch.[136]

70.    Up to 40% of all fish caught worldwide are designated as "bycatch" and are subsequently killed or significantly injured before being returned to the water.[137]  Marine mammals such as dolphins and whales caught as bycatch are unable to surface for air, causing suffocation and painful death.[138] This troubling number of bycatch results in the death of roughly 300,000 dolphins and whales each year,[139] the vast majority of which are dolphins.[140]

//

---

[131] *Ecological Damage Caused by Driftnets,* JRANK, https://science.jrank.org/pages/2162/Drift-Net.html#:~:text=Drift%20nets%20are%20used%20to,dead%2C%20back%20to%20the%20ocean.

[132] *Id.*

[133] *Id.*

[134] *Id.*

[135] *Fishing Gear: Pelagic Longlines*, *supra* note 7.

[136] *Longline*, INTERNATIONAL SEAFOOD SUSTAINABILITY FOUNDATION, https://www.iss-foundation.org/tuna-stocks-and-management/tuna-fishing/fishing-methods/longline/.

[137] *Bycatch: A Sad Topic; Food and Agriculture Organization of the United Nations, A Third Assessment of Global Marine Fisheries Discards (2018)*, WWF; *see also* Dirk Zeller, et at., *Global Marine Fisheries Discards: A Synthesis of Reconstructed Data*, 19:1 FISH AND FISHERIES 30-39 (June 26, 2017).

[138] *Id.*

[139] *Catching Fish, Not Flukes and Flippers: A Global Effort to Reduce Whale and Dolphin Bycatch,* WWF, https://wwf.panda.org/discover/knowledge_hub/endangered_species/cetaceans/threats/bycatch/?.

[140] Rene Ebersole, *How 'Dolphin Safe' is Canned Tuna, Really?*, NATIONAL GEOGRAPHIC (Mar. 10, 2021), www.nationalgeographic.com/animals/article/how-dolphin-safe-is-canned-tuna#:~:text=The%20three%20largest%20U.S.%20tuna,and%20a%20commitment%20to%20sustainability.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

29

71.     Longline fishing, for example, involves lines that can be as long as 62 miles that have as many as 10,000 baited hooks attached, and draws the line in every 12-24 hours, killing and harming numerous marine mammals.[141] A report from the National Resources Defense council states that scientists estimate over 650,000 marine mammals are killed or seriously injured every year as a result of incidental bycatch.[142]

72.     Despite what seems to be an already staggering number, the figure is likely even higher, since commercial fishermen are incentivized to underreport bycatch, which is facilitated by rampant lack of accountability and widespread unreliable reporting on bycatch. In fact, in 2005, less than half of the fishing vessels around the world recorded quantitative statistics on annual bycatch.[143] This problem holds true in the United States as well. Despite federal legislation such as the Magnuson-Stevens Act requiring detailed reporting on bycatch statistics by U.S. fisheries, there are too few unbiased reporters onboard fishing vessels to get an accurate metric of annual bycatch. Exacerbating this problem is the lack of governmental reporting. The U.S. National Marine Fisheries Service last provided an update to its U.S. National Bycatch Report in 2019, but this update was based on data from 2014 and 2015.[144] A recent report found that "*only four* out of hundreds of U.S. fisheries are meeting the recommended standards for the statistical accuracy and validity of their catch data, if they report data at all." [145]

73.     This lack of transparency, combined with the self-policing nature of the industry allows major tuna producers and distributors like Defendant to reap the benefits of harmful fishing practices all the while falsely promising to consumers that its Products are sustainably sourced "Dolphin Safe" tuna.

//

//

---

[141] Kevin T Fitzgerald, *Longline fishing (how what you don't know can hurt you)*, TOP COMPANION ANIM. MED. (November 28, 2013), doi: 10.1053/j.tcam.2013.09.006.
[142] *Net Loss: The Killing of Marine Mammals in Foreign Fisheries*, National Resources Defense Council (January 2014), https://www.nrdc.org/sites/default/files/mammals-foreign-fisheries-report.pdf.
[143] Amanda Keledjian, et al., *Wasted Catch: Unsolved Problems in U.S. Fisheries*, OCEANA (2014), available at https://oceana.org/reports/wasted-catch-unsolved-problems-us-fisheries/.
[144] Lee R. Benaka, et al., *U.S. National Bycatch Report First Edition Update 3*, U.S. NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION (February 2019).
[145] Keledjian, *supra* note 143.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**E.      Defendant's Deceptive Track and Verification Representations**

74.      Defendant's promises that the Products are "100% Traceable From Sea to Shelf," which leads Plaintiff and other reasonable consumers to believe that they can trace the tuna Product they purchase all the way back to where it was caught. In reality, consumers are unable to access any tracing information on Defendant's website or packaging.[146]  Defendant even mentions on its website that the only tracing system it has in place is for farmed shrimp products, not tuna.[147]

75.      Defendant and its suppliers are also not able to trace their tuna "100%" from sea to shelf because of data issues, supply chain complexities, and even human error.[148]  Defendant also explicitly acknowledges increasing pressure to make complex seafood supply chains *more* transparent, confirming that it not "100%" transparent as it represents.[149]  *See* **Exhibit 9,** *infra.*

**Exhibit 9**



76.      Defendant purports to pioneer end-to-end traceability systems, such as a system it uses only to track shrimp called TruTrace—a cloud-based blockchain software—to understand the connection between the seafood it sells and the people and places that help produce it.[150] However,

---

[146] *Sustainable Fisheries & Aquaculture*, *supra* note 61.
[147] *Id.*
[148] *see infra, see also Trace My Catch*, *supra* note 92.
[149] *Traceability in Farmed Shrimp*, *supra* note 64.
[150] *Sustainable Fisheries & Aquaculture*, *supra* note 61.

Defendant makes no effort to actually foster transparency with its customers regarding its tuna Products despite the Product label claim indicating that the tuna is "100%" traceable.[151] And even if Defendant adopts the same system for tuna, transparency would still be lacking, as no other information is detailed on its website and any data collected by TruTrace is accessible on its platform only by Defendant itself.[152]

77.     According to Greenpeace, "[Defendant] must improve monitoring, oversight, and conditions in valuable and risky tuna supply chains."[153] Defendant itself acknowledges that consumers are demanding more transparency from the fishing industry, recognizing traceability as a matter of consumer importance.[154]

78.     By including on the Product's front packaging that it is "100% Traceable from Sea to Shelf," Defendant recognizes that transparency is material to consumers' purchasing decisions. Yet, Defendant does not provide information that would allow a consumer to track the tuna in the Products, it does not disclose the fact that the fishing methods used by its suppliers is unsustainable and hazardous to dolphins, and does not report the number of dolphins killed and harmed by its tuna fishing vessels anywhere that consumers could seek this material information.

79.     Bumble Bee, which unlike Defendant, allows consumers to view trace information on its website for its brand products, includes a disclaimer that such information is accurate to the best of its knowledge, but unintentional errors may sometimes occur – further acknowledgement that a "100%" traceable claim is neither feasible nor accurate.[155]  And as consumers have noted, the codes on Bumble Bee's tuna cans are hard to read and do not always register in the Bumble Bee system.[156]

80.     Defendant's representation that the tuna in the Products is "100% traceable" is also misleading and inaccurate because the fishing industry is known for circumventing regulations with many creative methods and in fact, lacks transparency.[157] Issues like transshipment at sea, forced labor, and illegal and unregulated fishing are widespread and make transparency of the seafood

---

[151] *Id.*
[152] *Pricing*, TRUETRACE, https://trutrace.co/pricing-trutrace/.
[153] Stride, *supra* note 108.
[154]  *Sustainable Fisheries & Aquaculture*, *supra* note 61.
[155] *Trace My Catch, supra* note 92.
[156] *Kirkland Albacore Tuna Review,* SHOPPING WITH DAVE, https://shoppingwithdave.com/kirkland-albacore-tuna-review/.
[157] *2021 Tuna Retailer Scorecard*, *supra* note 95.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

supply chain challenging and at times, impossible for tuna producers.[158] Despite legislation, transshipment at sea of tuna, which allows commercial tuna fishers to hide their most damaging practices, has increased 67% between 2012 and 2017.[159]

81.    Defendant's suppliers also fail to keep accurate records of their effects on cetaceans and marine life. For example, in its 2022 Impact and Sustainability Report, Bumble Bee claims to have partnered with the Global Dialogue on Seafood Sustainability ("GDST"), an international, business-to-business platform that established the first ever global industry standards for seafood traceability, to improve its sustainable seafood assessments and claims.[160] However, the GDST does not currently have a mechanism to independently verify the validity of claims made by tuna fisheries pertaining to their compliance with and implementation of GDST standards.[161]

82.    Similarly, FCF ranks in the <u>bottom</u> fifty percent of all companies included in the Seafood Stewardship Index, which measures "how the world's leading seafood companies contribute to the sustainable management of our oceans and coastal ecosystems, as well as how they help ensure responsible social practices are implemented across all stages of the supply chain." Specifically, FCF's auditing system lacks transparency and a company-wide approach. Furthermore, the company's focus on obtaining third-party certifications makes it difficult to assess the company's efforts and impact on the ecosystems it profits from.[162]

**F.    Defendant's "Dolphin Safe" Representations are False, Deceptive, and Misleading to Reasonable Consumers**

83.    Plaintiff and other consumers reasonably believed that no dolphins are harmed or killed in the manufacturing of the Products based on Defendant's own dolphin safety and sustainability representations, including: Defendant's use of its own special "Dolphin Safe" logo on the Products (*see* **Exhibit 2**); labeling and advertising claims that the Products are "Dolphin Safe"

---

[158] *Id.*
[159] *Id.*
[160] *Seafood Future*, BUMBLE BEE, https://issuu.com/marketing-bumblebee/docs/bumble_bee_seafood_future_report_2022_draft.v13?fr=sZTRkODUwNjE4ODc.
[161] *GDST Standards and Materials*, GLOBAL DIALOGUE ON SEAFOOD TRACEABILITY, https://traceability-dialogue.org/what-is-the-global-dialogue/.
[162] *FCF Co. Ltd.*, WORLD BENCHMARK ALLIANCE, https://www.worldbenchmarkingalliance.org/publication/seafood-stewardship-index/companies/fcf-co/.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

(*see* **Exhibits 2-6,** *supra*); a press release ensuring no dolphins are harmed in sourcing tuna and sustainability is top priority (*see* ¶ 25); claiming 100% traceability (*see* **Exhibits 3 and 5**, *supra*); and promises of sustainable fishing methods and sourcing (*see* **Exhibits 3, 7- 9**, *supra*).

84.   Defendant's "Dolphin Safe" representations exceed the requirements of the DPCIA, and violates its own heightened standard because Defendant's tuna Products are sourced using fishing methods that are known to harm and kill dolphins and other marine life, and thus, not sustainable. Defendant therefore deceives consumers by promising a higher dolphin-safe standard then what the DPCIA requires and then breaks that promise by utilizing fishing methods known to harm and kill dolphins.

85.   When presented with the option of choosing between "Dolphin Safe" and dolphin unsafe tuna, American consumers overwhelmingly chose to purchase the former.[163] Indeed, dolphin safety is material and valuable to a consumers purchasing decision and in fact, studies on consumer behavior have found that "Dolphin Safe" labeling affects consumer behavior, and such labeling has contributed to an increase in the market share of canned tuna.[164] This research highlights the fact that consumers are willing to pay more in order to avoid personally contributing to the killing or harming of dolphins during tuna fishing. The price premium for "Dolphin Safe" tuna reflects consumer demand and the higher production costs of dolphin safety.[165]  In response to consumers' desire for sustainable products, many companies, like Defendant, have decided to manufacture, market, and sell purportedly sustainable products, such as its "Dolphin Safe" Products, in an effort to gain market share.

86.   A consumption survey carried out by insights company GlobalScan in July of 2016 on behalf of the MSC – which surveyed over 16,000 seafood consumers worldwide – found that sustainability was rated more favorably than price and brand when it comes to ocean preservation; nearly 72 percent of participants agree that shoppers should only purchase food from sustainable

---

[163] *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007) (noting that as a result of consumer choice between dolphin-safe and dolphin-unsafe tuna products, "foreign sellers who did not adjust their fishing methods were quickly forced out of the market").
[164] *See* Mario F. Teisl, et al., *Can Eco-Labels Tune a Market? Evidence from Dolphin-Safe Labeling*, J. Environ. Econ. Manag. (2002)., https://www.sciencedirect.com/science/article/abs/pii/S0095069600911860.
[165] Mitchell, *supra* note 24.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

sources to ensure ocean longevity.[166] Nearly all of the households surveyed (85 percent) admitted to purchasing seafood on a regular basis, with 68 percent adamantly stating that consumers should be prepared to switch to more sustainable seafood moving forward.[167] Consequently, manufacturers and distributors of "Dolphin Safe" tuna, such as Defendant, have taken advantage of this demand for sustainability sourced tuna by making sustainability representations as part of their "Dolphin Safe" marketing campaign, as detailed *supra*.

87. Based on Defendant's own "Dolphin Safe" representations, Plaintiff and other reasonable consumers believe that the Products are manufactured using sustainable fishing practices that do not kill or injure dolphins. This is precisely the message that Defendant has consistently conveyed to the public in their widespread advertising and marketing campaign, which promises consumers something more than what the DPCIA requires. That means reasonable consumers believe that the Products do not contain tuna product harvested using fishing practices which kill or injure dolphins. This perception is also consistent with standard dictionary definitions, regulatory definitions, and the California legislature's interpretation of environmental advertising claims.

    a. **Dictionary—Safe.** The Merriam-Webster standard dictionary defines "safe" as "free from harm or risk."[168]

    b. **FTC Green Guides.** Notably, the FTC promulgated the Guides for the Use of Environmental Marketing Claims, codified at 16 C.F.R. 260.1, *et seq.* ("**Green Guides**"), to "help marketers avoid making environmental marketing claims that are unfair or deceptive" based on the FTC's "views on how reasonable consumers likely interpret [those] claims." *Id.* at § 260.1(a), (d). In its view, "[u]nqualified general environmental benefit claims . . . likely convey that the product . . . has specific and far-reaching environmental benefits and may convey that the item . . . has ***no negative environmental impact***." *Id.* at § 260.4(b) (providing "***Eco-Friendly***" as an example) (emphasis added).

---

[166] Madelyn Kearns, *New survey sees seafood consumers placing sustainability before price and brand*, SEAFOODSOURCE OFFICIAL MEDIA (2016), https://www.seafoodsource.com/news/foodservice-retail/new-survey-sees-seafood-consumers-placing-sustainability-before-price-and-brand.

[167] *Id.*

[168] *Safe*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/safe.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

c.  **California Legislature.** The California legislature codified the Green Guides to make it "unlawful for a person to make an untruthful, deceptive, or misleading *environmental claim*, whether explicit or implied" (emphasis added). Cal. Bus. & Prof. Code § 17580.5. California viewed terms "on the label or container of a consumer good" like "environmental choice," "*ecologically friendly*," "*earth friendly*," "*environmentally friendly*," "ecologically sound," "environmentally sound," "environmentally safe," "ecologically safe," "environmentally lite," "green product," "*or any other like term*," to mean that the product "*is not harmful to*, or is beneficial to, *the natural environment*." *Id.* at §§ 17580(a) (emphasis added); *see also id.* at § 17581 (criminalizing such deceptive labeling claims).

d.  The Merriam-Webster standard dictionary defines "environment" as "the complex of physical, chemical, and biotic factors (such as climate, soil, and *living things*) that act upon an *organism* or an *ecological community* and ultimately determine its form and *survival*." (emphasis added). As previously and subsequently outlined, this case concerns use of fishing methods that are known to kill or cause harm to dolphins. Dolphins are a vital part of the natural environment not only because they are living things but because they keep ecosystems in balance, disperse nutrients, and mix water in stratified oceans and rivers.[169] Thus, advertising, labeling, and representing the Products as sustainably sourced "Dolphin Safe" tuna while simultaneously using harmful fishing methods to harvest its Products, Defendant is violating California law.

88.  **Other Courts Have Deemed Consumer Claims Regarding Similar Product Representations to Be Actionable.** Defendant is not the first tuna company seller to engage in deceptive practices only to find itself embroiled in controversy. Some of the largest tuna suppliers in the world have already faced class action lawsuits claiming that they defrauded consumers by advertising their "Dolphin Safe" fishing methods and sustainable practices.[170] For example, in *Gardner v. StarKist Co*., 2020 U.S. Dist. LEXIS 56679 (N.D. Cal. 2020), the plaintiff brought suit against Starkist pursuant in part to Civil Code Section 1750, California's Consumers Legal

---

[169] Kiszka, *supra* note 17.
[170] Ebersole, *supra* note 140.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Remedies Act ("CLRA"), for falsely labeling its tuna product as "Dolphin Safe" despite employing fishing practices that either killed or harmed dolphins, thereby being inconsistent with its own heightened representations of sustainability and dolphin safety that exceeded the DPCIA requirements. This Court denied Starkist's Rule 12(b)(6) motion, ruling the product's "Dolphin Safe" claims misled reasonable consumers since defendant's fishing techniques were known to cause dolphin injuries and deaths. Like Starkist, Costco's "Dolphin Safe" and sustainability representations exceeds DPCIA requirements and are false and deceptive under California's consumer protection laws because the Products are sourced using unsustainable fishing practices known to harm and kill dolphins.

89. **Other Companies That Sell "Dolphin Safe" Tuna Use Safe and Sustainable Fishing Methods.** There are companies that manufacture tuna products that are truly safe for dolphins because they use the sustainable pole-and-line fishing method for catching tuna. For example, Whole Foods 365 Everyday Value Brand[171] and American Tuna brand[172] only uses the pole and line fishing method for its tuna products. The pole and line fishing involves catching one fish at a time which ensures dolphins are not harmed or killed and allows unintended marine species that are accidently caught to be released in an easy and quick manner.[173] Pole and line fishing only accounts for ten percent of tuna caught today.[174] Although more labor intensive and expensive than other commercial fishing methods, it allows for sustainable tuna sourcing and ensures dolphins and other marine life are not killed or harmed.[175] Defendant does not use the pole and line method to source the tuna in its Products; instead, it employs fishing methods known to harm and kill dolphins.

//

//

//

---

[171] *See*, Whole Foods' website, available at, https://www.wholefoodsmarket.com/product/365-by-whole-foods-market-canned-wild-tuna-albacore-in-water-with-salt-added-100-pole-line-caught-5-oz-b074h55nkk.

[172] *See,* American Tuna's website, available at, https://americantuna.com/sustainability/.

[173] *Pole and Line*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types/pole-and-line.

[174] Amy McDermott, *Attention shoppers: "Pole and line" is today's eco-friendliest label for canned tuna*, OCEANA (December 18, 2018), https://oceana.org/blog/attention-shoppers-pole-and-line-todays-eco-friendliest-label-canned-tuna/.

[175] *Id.*

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

**G.      Defendant Misled Plaintiff and Other Reasonable Consumers Who Relied on the Material and False "Dolphin Safe" Representations to Their Detriment**

90.     **Material.** The false advertising claims were and are material to reasonable consumers, including Plaintiff, in deciding to purchase the Products.

91.     **Reliance.** Plaintiff and reasonable consumers relied and rely on Defendant's false labeling and advertising claims that the Products are "Dolphin Safe" in making the decision to purchase the Products.

92.     **Consumers Lack Knowledge of Falsity.** At the time Plaintiff and reasonable consumers purchased the Products, they did not know, and had no reason to know, that the Products' "Dolphin Safe" label and advertising claims were, in fact, false, misleading, deceptive, and unlawful as set forth herein.

93.     **Misrepresentation/Omission.** The "Dolphin Safe" representations materially misrepresented the Products were manufactured using sustainable fishing practices that do not kill or injure dolphins, and Defendant failed to adequately inform reasonable consumers, including Plaintiff, that the Products were not in fact "Dolphin Safe" given the fishing methods used to source the tuna.

94.     **Defendant's Knowledge.** Defendant knew, or should have known, that the "Dolphin Safe" representation was false, misleading, deceptive, and unlawful, at the time that it advertised the Products using the "Dolphin Safe" representations, and Defendant intentionally and deliberately used the "Dolphin Safe" representations on the Products' labeling, packaging, and advertising to cause Plaintiff and similarly situated consumers to believe that the Products are made using fair and sustainable fishing practices that do not kill or cause harm to dolphins. The conspicuousness of the challenged representation on the Products' labels and repeated use of the challenged representation in advertisements demonstrate Defendant's awareness of the materiality of said representations and understanding that consumers prefer and are motivated to buy tuna products that contain tuna harvested by methods that do not harm dolphins. Generally, manufacturers and marketers repeat marketing messages to emphasize and characterize a brand or product line. Similarly, they reserve the front primary display panel of labels on consumer products of similar dimensions for the most

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

important and persuasive information that they believe will motivate consumers to buy the products. Defendant, as the manufacturer, manufactured the Products using harmful fishing practices. Defendant, as the manufacturer, had exclusive control over the "Dolphin Safe" label inclusion on the Products' labels and in their advertisements. Defendant is and was, at all times, statutorily required to ensure the manufacturing of its Products did not in fact harm, injure, or kill any dolphins in order to be consistent with its "Dolphin Safe" representations. Thus, Defendant knew, or should have known, at all relevant times, that the "Dolphin Safe" labeling and advertising was and is false and deceptive. Defendant further knew that reasonable consumers, including Plaintiff, were and are misled into buying the Products based on the mistaken belief that the challenged "Dolphin Safe" representation is true.

95.    **Detriment.** Plaintiff and reasonable consumers would not have purchased the Products, or would have purchased the Products on different terms, if they had known the truth—that the "Dolphin Safe" representations are false, and the Products are sourced using fishing methods that kill and injure dolphins. Accordingly, based on Defendant's material misrepresentations, reasonable consumers, including Plaintiff, purchased the Products to their detriment.

**H.    No Adequate Remedy at Law**

96.    Plaintiff and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

a.    **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitations under the FAL and CLRA. In addition, the statutes of limitations vary for certain states' laws for breach of warranty and unjust enrichment/restitution, between approximately 2 to 6 years. Thus, California Subclass members who purchased the Products more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.  Similarly, Nationwide Class members who purchased the Products prior to the furthest reach-back under the statute of limitations for breach

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    of warranty, will be barred from recovery if equitable relief were not permitted for

2    restitution/unjust enrichment.

3    b.  **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under

4    the unfair prong of the UCL is broader than the other causes of action asserted herein.

5    It includes, for example, Defendant's overall unfair marketing scheme to promote and

6    brand the Products with the "Dolphin Safe" representations, across a multitude of

7    media platforms, including the Products' labels and packaging, over a long period of

8    time, in order to gain an unfair advantage over competitor products and to take

9    advantage of consumers' desire for products that comport with the said

10   representations. The UCL also creates a cause of action for violations of law (such as

11   statutory or regulatory requirements related to representations and omissions made on

12   the type of products at issue).  Thus, Plaintiff and Class members may be entitled to

13   restitution under the UCL, while not entitled to damages under other causes of action

14   asserted herein (e.g., the FAL requires actual or constructive knowledge of the falsity;

15   the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires,

16   by purchase or lease, any goods or services for personal, family, or household

17   purposes) and other statutorily enumerated conduct).    Similarly, unjust

18   enrichment/restitution is broader than breach of warranty.  For example, in some

19   states, breach of warranty may require privity of contract or pre-lawsuit notice, which

20   are not typically required to establish unjust enrichment/restitution.  Thus, Plaintiff

21   and Class members may be entitled to recover under unjust enrichment/restitution,

22   while not entitled to damages under breach of warranty, because they purchased the

23   products from third-party retailers or provide adequate pre-lawsuit notice prior to the

24   commencement of this action.

25   c.  **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief

26   is appropriate on behalf of Plaintiff and members of the Class because Defendant

27   continues to misrepresent the Products with the "Dolphin Safe" representations.

28   Injunctive relief is necessary to prevent Defendant from continuing to engage in the

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts.  Such disclosures would include, but are not limited to, publicly disseminated statements that the Products' "Dolphin Safe" representations are not true and providing accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front label concerning the Products' true nature.  An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiff is unable at present to accurately quantify the damages caused by Defendant's future harm, rendering injunctive relief all the more necessary. For example, because the court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective purchasing practices, prices of future Product sales, and quantities of future Product sales.

d.   **Public Injunction.** Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

e.   **California vs. Nationwide Class Claims**. Violation of the UCL, FAL, and CLRA are claims asserted on behalf of Plaintiff and the California Subclass against non-California Defendant, while breach of warranty and unjust enrichment/restitution are asserted on behalf of Plaintiff and the Nationwide Class. Dismissal of farther-reaching claims would bar recovery for non-California members of the Class.

f.   **Procedural Posture—Incomplete Discovery & Pre-Certification.** Lastly, this is the first amended complaint and discovery has not yet commenced and/or is at its initial

stages. No class has been certified yet. The completion of fact/non-expert and expert discovery, as well as the certification of this case as a class action, are necessary to finalize and determine all available and unavailable remedies, including legal and equitable, for Plaintiff's individual claims and any certified class or subclass. Plaintiff therefore reserves her right to amend this complaint and/or assert additional facts that demonstrate this Court's jurisdiction to order equitable remedies where no adequate legal remedies exist for either Plaintiff and/or any certified class or subclass. Such proof, to the extent necessary, will be presented prior to the trial of any equitable claims for relief and/or the entry of an order granting equitable relief.

97.     Plaintiff does not seek to impose additional or conflicting labeling, testing, or warning requirements as it relates to the "Dolphin Safe" claim; rather, Plaintiff seeks to cure Defendant's own "Dolphin Safe" representations about the Products, which exceed the DPCIA requirements and are not mandated by the FDA. *See* 16 U.S.C. § 1385 (no provisions requiring the inclusion of a "Dolphin Safe" label claim on tuna products). Congress or the FDA have not promulgated regulations *requiring* environmental claims such as "Dolphin Safe" on canned tuna products, let alone one that would conflict with enjoining Defendant's misleading use of this claim. As such, Plaintiff is not seeking to impose labeling requirements that differ from any established by Congress or the FDA.

## VI.   CLASS ALLEGATIONS

98.     **Class Definition.** Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and all others similarly situated, and as members of the Classes defined as follows:

> All residents of the United States who, within the applicable statute of limitations periods, purchased the Products ("Nationwide Class"); and

> All residents of California who, within four years prior to the filing of this Complaint, purchased the Products ("California Subclass").

> ("Nationwide Class" and "California Subclass," collectively, "Class").

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

99.     **Class Definition Exclusions.** Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

100.    **Reservation of Rights to Amend Class Definition.** Plaintiff reserves the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

101.    This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

102.    **Numerosity:** Members of the Class are so numerous that individual joinder is impracticable. On information and belief, the Class consists of tens of thousands of purchasers (if not more) dispersed throughout California and the United States.  Accordingly, it would be impracticable to join all members of the Class before the Court.

103.    The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

104.    **Common Questions Predominate:** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

      a.   Whether Defendant's conduct constitutes an unfair method of competition or unfair or deceptive act or practice in violation of California Civil Code Section 1750, *et seq.*;

      b.   Whether Defendant used deceptive representations in connection with the sale of the Products in violation of California Civil Code Section 1750, *et seq.*;

c. Whether Defendant represented the Products have characteristics that they do not have in violation of California Civil Code Section 1750, *et seq.*;

d. Whether Defendant advertised the Products with the intent not to sell them as advertised in violation of California Civil Code Section 1750, *et seq.*;

e. Whether Defendant's advertising is untrue or misleading within the meaning of Business and Professions Code Section 17500, *et seq.*;

f. Whether Defendant knew or by the exercise of reasonable care should have known its advertising was and is untrue or misleading in violation of Business and Professions Code Section 17500, *et seq.*;

g. Whether Defendant made false and misleading representations in its advertising and labeling of the Products in violation of Business and Professions Code Section 17500, *et seq.*;

h. Whether Defendant's conduct is an unfair business act or practice within the meaning of Business and Professions Code Section 17200, *et seq.*;

i. Whether Defendant's conduct is a fraudulent business act or practice within the meaning of Business and Professions Code Section 17200, *et seq.*;

j. Whether Defendant's conduct is an unlawful business act or practice within the meaning of Business and Professions Code Section 17200, *et seq.*;

k. Whether Defendant's conduct constitutes a breach of express warranty;

l. Whether Defendant's conduct constitutes a breach of implied warranty;

m. Whether Defendant was unjustly enriched by its deceptive conduct;

n. Whether Plaintiff and the Class paid more money or a premium amount for the Products than they actually received; and

o. How much more money or premium amount Plaintiff and the Class paid for the Products than they actually received?

105. **Typicality**: Plaintiff's claims are typical of the claims of the Class Members she seeks to represent because Plaintiff, like the Class Members, purchased Defendant's misleading and deceptive Product. Defendant's unlawful, unfair and/or fraudulent actions concern the same

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

business practices described herein irrespective of where they occurred or were experienced. Plaintiff and the Class sustained similar injuries arising out of Defendant's conduct. Plaintiff's and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

106. **Adequacy**: Plaintiff is an adequate representative of the Class she seeks to represent because her interests do not conflict with the interests of the Class Members Plaintiff seeks to represent. Plaintiff will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

107. **Superiority and Substantial Benefit**: A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for the Class to prosecute their claims individually. A class action would be more efficient and manageable for at least the following reasons:

    a. The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

    b. Absent a Class, the members of the Class will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys their ill-gotten gains;

    c. Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    d. When the liability of Defendant has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

    e. This action presents no difficulty that would impede their management by the Court as a class action, which is the best available means by which Plaintiff and Class Members can seek redress for the harm caused to them by Defendant.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

108.   **Inconsistent Rulings.** Because Plaintiff seeks relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

109.   **Injunctive/Equitable Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

110.   **Manageability.** The trial and litigation of Plaintiff's claims are manageable. Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

111.   Individual litigation of the legal and factual issues raised by Defendant's conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

## COUNT ONE

### Violation of California Consumers Legal Remedies Act,

### California Civil Code 1750, *et seq*.

### *(Brought on behalf of the California Subclass)*

112.   Plaintiff repeats and re-alleges the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

113.   Plaintiff brings this cause of action pursuant to Civil Code Section 1750, *et seq.*, the Consumers Legal Remedies Act ("CLRA"), on her own behalf and on behalf of all other persons similarly situated. Plaintiff seeks to represent as defined in Paragraphs 98-99.

114.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transaction with Plaintiff and the California Sub-Class which were intended to result in, and did result in, the sale of the Products:

(5) Representing that [Products]…characteristics,…uses [and] benefits …which [they do] not have …

(7) Representing that [Products] are of a particular standard, quality, or grade …if they are of another

(9) Advertising [the Products] …with intent not to sell them as advertised.

115.   The Class consists of thousands of persons, the joinder of whom is impracticable.

116.   There are questions of law and fact common to the Class, which questions are substantially similar and predominate over questions affecting the individual Class members, as set forth hereinabove.

117.   The CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale of goods.

118.   The practices described herein, specifically Defendant's packaging, advertising, and sale of the Products, were intended to result and did result in the sale of the Products to the consuming public and violated and continue to violate the CLRA by (1) using deceptive representations in connection with the Products; and (2) advertising, labeling, and packaging the Products with intent not to sell them as advertised.

119.   Defendant fraudulently deceived Plaintiff and the Class by misrepresenting the Products as having characteristics which they do not have, e.g., labeling and advertising the Products as sustainably sourced "Dolphin Safe" tuna. In doing so, Defendant intentionally misrepresented and concealed material facts from Plaintiff and the Class. Said misrepresentations and concealment were done with the intention of deceiving Plaintiff and the Class and depriving them of their legal rights and money.

120.   Defendant knew or should have known, through the exercise of reasonable care, that the Products' labeling and advertising were misleading.

121.   Defendant's actions as described herein were done with conscious disregard of Plaintiff's rights, and Defendant was wanton and malicious in its concealment of the same.

122.   Defendant's labeling and advertising of the Products were material factors in Plaintiff's decision to purchase the Products. Based on Defendant's labeling and advertising of the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Products, Plaintiff reasonably believed that she was purchasing Products that were manufactured using methods that were safe for dolphins. In actuality, the Products were manufactured using methods that kill and injure dolphins, not using methods that were safe for dolphins. Had she known the truth of the matter, Plaintiff would not have purchased the Product.

123. Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's unfair, unlawful, and fraudulent conduct. Specifically, Plaintiff and the Class paid for Products that were different from what they were reasonably expecting when they decided to make their respective purchases. Plaintiff and the Class would not have purchased the Products had they known the claims were false.

124. Defendant's false and misleading labeling and advertising should be enjoined due to its false, misleading and/or deceptive nature.

125. By letter dated November 12, 2021, Plaintiff advised Defendant of its false and misleading claims pursuant to California Civil Code Section 1782(a).

126. Pursuant to Section 1780(a) of the Act, Plaintiff seeks injunctive relief in the form of an order enjoining the above-described wrongful acts and practices of Defendant, including, but not limited to, an order enjoining Defendant from continuing to make the label and advertising claim challenged herein.

127. Plaintiff shall be irreparably harmed if such an order is not granted. Plaintiff also seeks restitution.

<u>COUNT TWO</u>

**Violation of California False Advertising Law,**

**Business & Professions Code 17500,** ***et seq.***

***(Brought on behalf of the California Subclass)***

128. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs and incorporates the same as if set forth herein at length.

129. Plaintiff brings this cause of action pursuant to Business and Professions Code Section 17500, *et seq.*, individually and on behalf of the Class. Plaintiff

//

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

130.    California's False Advertising Law, California Business and Profession Code Section 17500, *et seq*., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, in any advertising device or in any other manner or means whatever, including over the Internet, any statement, concerning personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

131.    Defendant knowingly spread misleading claims regarding the Products as a means to mislead the public that the Products are manufactured in a manner that is safe for dolphins.

132.    Defendant controlled the labeling, packaging, production, and advertising of the Products. Defendant knew or should have known, through the exercise of reasonable care, that its "Dolphin Safe" representations and omissions about the Products were untrue, deceptive, and misleading.

133.    Defendant's actions of advertising and displaying misleading claims and falsely labeling the Products "Dolphin Safe" in prominent type face on each Product label are highly likely to deceive consumers in regard to the actual nature of these products.

134.    Defendant's actions in violation of Section 17500 were false and misleading such that the general public is and was likely to be deceived.

135.    Pursuant to Business & Professions Code Section 17535, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its unlawful business practice. Likewise, Plaintiff and the Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant in amount to be determined by trial.

136.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's false representations. Plaintiff and the Class purchased the Products in reliance upon the representations by Defendant that the Products were "Dolphin Safe." Plaintiff would not have purchased the Products if she had known that the claims and advertising as described herein were false.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

# COUNT THREE

## Violation of California Unfair Competition Law,

## Business & Professions Code Section 17200, *et seq.*

### *(Brought on behalf of the California Subclass)*

137.    Plaintiff repeats and re-alleges the allegations set forth above and incorporates the same as if set forth herein at length.

138.    Plaintiff brings this cause of action pursuant to Business and Professions Code Section 17200, *et seq.*, on their own behalf and on behalf of the Class.

139.    The UCL prohibits "any unlawful, unfair... or fraudulent business act or practice." Cal. Bus & Prof. Code § 17200.

### A.    "Unfair" Prong

140.    Under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et. seq.,* a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California,* 142 Cal. App. 4th 1394, 1403 (2006).

141.    Defendant's actions of advertising and labeling the Products as being "Dolphin Safe" are false, misleading, and deceptive.

142.    Defendant's actions of falsely advertising its Products as "Dolphin Safe" cause injuries to consumers.

143.    Through false, misleading, and deceptive advertising and labeling of the Products, Defendant seeks to take advantage of consumer's desires for products that are Dolphin Safe, while reaping the financial benefits of manufacturing the Products in manner that kills and injures dolphins.

144.    When Defendant claims that the Products are "Dolphin Safe," it provides false promises to consumers, which reduces consumer choice. This also increases the cost to consumers because the unfair business practice allows Defendant to produce the Products more inexpensively, which in turn, stifles competition in the marketplace of manufacturers who incur additional costs in

manufacturing a competing product that is truthfully advertised as "Dolphin Safe" because it is sourced from tuna caught using fishing methods which do not kill or injure dolphins.

145.   Consumers cannot avoid any of the injuries caused by Defendant's false and misleading advertising of the Products.

146.   Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. In doing so, the courts "weigh the utility of the Defendant's conduct against the gravity of the harm alleged to the victim." *Davis v. HSBC Bank Nevada, N.A.,* 691 F. 3d 1152, 1169 (9th Cir. 2012).

147.   Defendant's false promise results in financial harm to consumers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of its harm.

148.   Some courts require the "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.,* 504 F. 3d 718, 735 (9th Cir. 2007).

149.   Defendant's labeling and advertising of the Products is false, deceptive, misleading, and unreasonable, and constitutes an unfair business practice within the meaning of California Business & Professions Code Section 17200.

150.   There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein. Defendant could have marketed the Products without making any false statements about the safety of dolphins in the manufacturing of the Products.

151.   All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

152.   Pursuant to Business & Professions Code Section 17203, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising and labeling of the Products.  Likewise, Plaintiff and the Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

order awarding Plaintiff and the Class restitution of the money wrongfully acquired by Defendant in an amount to be determined at trial.

153.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff paid an unwarranted premium for the Products. Plaintiff would not have purchased the Products had she known that the Products were not created in a sustainable dolphin-safe manner as represented, or certainly would not have paid a premium.

### B.    "Fraudulent" Prong

154.    California Business and Professions Code Section 17200, *et seq*. considers conduct fraudulent and prohibits said conduct if it is likely to deceive members of the public. *Bank of the West v. Superior Court,* 2 Cal. 4th 1254, 1267 (1992).

155.    Defendant's advertising and labeling of the Products as "Dolphin Safe" is likely to deceive members of the public into believing that the Products are actually safe for dolphins when they are manufactured using methods known to kill and injure dolphins.

156.    Defendant's advertising and labeling of the Products, as alleged in the preceding paragraphs, is false, deceptive, misleading, and unreasonable and constitutes fraudulent conduct.

157.    Defendant knew or should have known of its fraudulent conduct.

158.    As alleged in the preceding paragraphs, the material misrepresentations by Defendant detailed above constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

159.    There were reasonably available alternatives to further Defendant's legitimate business interests. Defendant could have advertised and labeled the Products without making the false and deceptive "Dolphin Safe" representations.

160.    Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

161.    Pursuant to Business & Professions Code Section 17203, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products.  Likewise, Plaintiff and the Class seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding

Plaintiff restitution of the money wrongfully acquired by Defendant in an amount to be determined at trial.

162.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiff paid an unwarranted premium for the Products. Plaintiff would not have purchased the Products if she had known that the Products were not sold as advertised.

163.    **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiff and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products with the "Dolphin Safe" representation.

### C.    "Unlawful" Prong

164.    California Business and Professions Code Section 17200, *et seq.,* identifies violations of *other laws* as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.,* 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

165.    Defendant's advertising of the Products, as alleged in the preceding paragraphs, violates California Civil Code Section 1750, *et seq.,* and California Business and Professions Code Section 17500, *et seq.*

166.    Defendant's packaging, labeling, and advertising of the Products as being "Dolphin Safe" is false, deceptive, misleading, unfair, unlawful, and unreasonable.

167.    Defendant knew or should have known of its unlawful conduct.

168.    **Violations of Bus. & Prof. Code 17580, *et seq*. (Environmental Advertising).** Section 17580.5 makes it "unlawful for a person to make an untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied," and defines environmental marketing claims consistent with the Green Guides. The Green Guides caution marketers that "[i]t is deceptive to misrepresent, directly or by implication, that a product, package, or service offers a general environmental benefit," and warns marketers that such claims, for example, lead consumers to believe that the seller's wares have no negative environmental impact. 16 C.F.R. § 260.4. Similarly, section 17580 also identifies several examples of environmental labeling claims that are interpreted to mean that the product will not harm the environment, including: "environmental choice,"

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

"ecologically friendly," "earth friendly," "environmentally friendly," "ecologically sound," "environmentally sound," "environmentally safe," "ecologically safe," "environmentally lite," "green product," and similar terms. Indeed, section 17581 not only criminalizes such deceptive marketing claims, but authorizes the Court to award monetary penalties. The Merriam-Webster standard dictionary defines "environment" as "the complex of physical, chemical, and biotic factors (such as climate, soil, and living things) that act upon an organism or an ecological community and ultimately determine its form and survival." As previously and subsequently outlined, this case concerns sustainability and dolphin safety representatives. Yet, the fishing methods utilized by Defendant are unsustainable and known to kill or cause harm to dolphins. Dolphins are a vital part of the natural environment not only because they are living creatures but because they keep ecosystems in balance, disperse nutrients, and mix water in stratified oceans and rivers.  Thus, in representing its Products as "Dolphin Safe" tuna while simultaneously using unsustainable fishing methods known to harm and kill dolphins to source the tuna in the Products, Defendant is violating California law.

169.    As alleged in the preceding paragraphs, the misrepresentations by Defendant detailed above constitute an unlawful business practice within the meaning of California Business and Professions Code Section 17200.

170.    There were reasonably available alternatives to further Defendant's legitimate business interests. Defendant could have truthfully labeled and advertised the Products.

171.    All of the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

172.    Pursuant to Business and Professions Code Section 17203, Plaintiff and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of false and deceptive advertising of the Products. Plaintiff and the Class also seek an order requiring Defendant to disclose such misrepresentations, and additionally request an order awarding Plaintiff restitution of the money wrongfully acquired by Defendant in an amount to be determined at trial.

//

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

173.    Plaintiff and the Class have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiff paid an unwarranted premium for the Products. Plaintiff would not have purchased the Products if she had known that Defendant deceived consumers into believing the Products were "Dolphin Safe."

## COUNT FOUR

### Breach of Express Warranty

### *(Brought on behalf of the Class)*

174.    Plaintiff repeats and re-alleges the allegations of the previous paragraphs and incorporates the same as if set forth herein at length.

175.    Defendant expressly warrants that the Products are "Dolphin Safe," meaning the tuna was sourced from fishing methods that do not kill or harm dolphins.  Defendant's claims constitute an affirmation of fact, promise, and/or description of the goods that became part of the basis of the bargain and created an express warranty that the goods would conform to the stated promise. Plaintiff placed importance on Defendant's claims.

176.    By advertising and selling the Products at issue, Defendant made promises and affirmations of fact on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiff and members of the Class and Defendant. Defendant purports, through the Products' labeling and advertising, to create express warranties that the Products, among other things, conform to the challenged "Dolphin Safe" representation.

177.    All conditions precedent to Defendant's liability under this contract have been performed by Plaintiff and the Class.

178.    Defendant breached the terms of the contract, including the express warranties, with Plaintiff and the Class by not providing Products that conform to the "Dolphin Safe" advertising and label claims.

179.    As a result of Defendant's breach of contract, Plaintiff and the Class have been damaged in an amount to be determined at trial.

//

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

**COUNT FIVE**

**Breach of Implied Warranty**

***(Brought on behalf of the Class)***

180.    Plaintiff repeats and re-alleges the allegations set forth above and incorporates the same as if set forth herein at length.

181.    Unless excluded or modified, a warranty that a good shall be merchantable is implied in a contract for their sale, if the seller is a merchant with respect to goods of that kind.

182.    Defendant is a merchant with respect to the Products, as it manufactures, distributes, and sells the Products nationwide.

183.    In order to be merchantable, goods must conform to the promises or affirmations of fact made on the container or labeling.

184.    Defendant breached the implied warranty of merchantability to Plaintiff and the Class in that the labels of the Products promised and affirmed that the Products were "Dolphin Safe," meaning they were sourced using fishing methods which do not kill or injure dolphins.

185.    Contrary to the promise and affirmation of fact, the Products do not conform to the challenged "Dolphin Safe" representations and, therefore, Defendant breached its warranties about the Products and their qualities.

186.    As a direct and proximate result of Defendant's breach of its implied warranty, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial.

187.    Defendant did not exclude or modify the Products' implied warranty of merchantability.

188.    Plaintiff and the Class are therefore entitled to recover all available remedies for said breach.

//

//

//

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

## COUNT SIX

### Restitution Based on Quasi-Contract/Unjust Enrichment

### (*Brought on behalf of the Class*)

189.    Plaintiff repeats and re-alleges the allegations set forth above and incorporates the same as if set forth herein at length.

190.    Plaintiff brings this cause of action individually and on behalf of the members of the Class against Defendant.

191.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly sold the Products to Plaintiff and members of the Class in a manner that was unfair, unconscionable, and oppressive.

192.    Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and members of the Class.

193.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

194.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

195.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from selling the Product to Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances constitutes unjust enrichment.

196.    The financial benefits derived by Defendant rightfully belong to Plaintiff and members of the Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by Defendant.

197.    Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class defined herein, pray for judgment and relief on all Causes of Action as follows:

a. **Certification**: For an order certifying this action as a class action, appointing Plaintiff as the Class Representative, and appointing Plaintiff's Counsel as Class Counsel;

b. **Declaratory Relief**: For an order declaring that Defendant's conduct violates the statutes and laws which underpin this action;

c. **Injunction**: For an order requiring Defendant to immediately cease and desist from selling the unlawful Products in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d. **Damages/Restitution/Disgorgement**: For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiff and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e. **Attorneys' Fees and Costs**: For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f. **Pre/Post-Judgment Interest**: For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and

g. **All Just and Proper Relief**: For such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a jury trial on all triable issues.

DATED: October 4, 2022                    **CLARKSON LAW FIRM, P.C.**

                                          /s/ Bahar Sodaify
                                          Ryan J. Clarkson, Esq.
                                          Bahar Sodaify, Esq.
                                          Christina N. Mirzaie, Esq.

                                          *Attorneys for Plaintiff*